IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| ANDRE SUTTON | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, et al | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                                ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
and Human Services denying plaintiff Social Security Benefits.                                               ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
exposure to asbestos.                                                                                                        ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
commonly referred to as complex and that need special or intense management by
the court.  (See reverse side of this form for a detailed explanation of special
management cases.)                                                                                                          ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.          (X)

| | | |
|---|---|---|
| March 5, 2020 | James A. Wells, Esquire | Plaintiff |
| Date | Attorney-at-law | Attorney for |
| 215-567-7955 | 215-567-6809 | james@gayandchacker.com |
| Telephone | FAX Number | E-Mail Address |

(Civ. 660) 10/02

JS 44 (Rev. 02/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
SUTTON, ANDRE

**DEFENDANTS**
CITY OF PHILADELPHIA, et al
(SEE ATTACHED LIST)

**(b)** County of Residence of First Listed Plaintiff    Philadelphia
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Philadelphia
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
James A. Wells, Esq., Gay & Chacker, P.C.
1731 Spring Garden St., Phila., PA 19130  (215) 567-7955

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
Plaintiff

☒ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | ☐ 367 Health Care/ Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | ☐ 340 Marine | Injury Product | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| Student Loans | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | Liability | **PERSONAL PROPERTY** | **LABOR** | | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer |
| ☐ 160 Stockholders' Suits | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 862 Black Lung (923) | Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal | Property Damage | Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice | Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 865 RSI (405(g)) | Exchange |
| | | | | | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | Act/Review or Appeal of |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | Agency Decision |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| | Other | ☐ 550 Civil Rights | Actions | | State Statutes |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*
☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from Another District *(specify)*

☐ 6 Multidistrict Litigation - Transfer

☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. 1983
Brief description of cause:
Civil Rights

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
$1,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☒ Yes    ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____    DOCKET NUMBER _____

DATE
03/05/2020

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

<u>**DEFENDANT LIST**</u>

**CITY OF PHILADELPHIA**
     and
**OFFICER REGINALD GRAHAM,**
**(BADGE #6214), individually and**
**as a Police Officer for the City of**
**Philadelphia,**
     and
**OFFICERCARLOS BUITRAGO,**
**(BADGE # unknown), individually**
**and as a Police Officer for the City of**
**Philadelphia,**
     and
**PHILADELPHIA DISTRICT**
**ATTORNEY'S OFFICE,**
     and
**DISTRICT ATTORNEY SETH**
**WILLIAMS, individually and as the**
**City of Philadelphia District Attorney**
     and
**ASSISTANT DISTRICT ATTORNEY**
**JENNIFER LEONARDIS,**
**individually and as Assistant District**
**Attorney for the City of Philadelphia**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ 1001 W. Girard Avenue, J Bldg. Apt 307, Philadelphia, PA 19123 _____

Address of Defendant: _____ c/o Law Department 1515 Arch Street, 14th Floor, Philadelphia, PA 19107 _____

Place of Accident, Incident or Transaction: _____ Philadelphia, PA _____

---

*RELATED CASE, IF ANY:*

Case Number: _____    Judge: _____    Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?   Yes ☐   No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?   Yes ☐   No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?   Yes ☐   No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?   Yes ☐   No ☑

I certify that, to my knowledge, the within case ☐ is / ☐ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 03/05/2020    _____ *Must sign here* _____    72941
   *Attorney-at-Law / Pro Se Plaintiff*    *Attorney I.D. # (if applicable)*

---

CIVIL: (Place a √ in one category only)

**A.   Federal Question Cases:**

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Patent
☐ 6. Labor-Management Relations
☑ 7. Civil Rights
☐ 8. Habeas Corpus
☐ 9. Securities Act(s) Cases
☐ 10. Social Security Review Cases
☐ 11. All other Federal Question Cases
   *(Please specify):* _____

**B.   Diversity Jurisdiction Cases:**

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify):* _____
☐ 7. Products Liability
☐ 8. Products Liability – Asbestos
☐ 9. All other Diversity Cases
   *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____ James A. Wells, Esquire _____, counsel of record *or* pro se plaintiff, do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

DATE: 03/05/2020    _____ *Sign here if applicable* _____    72941
   *Attorney-at-Law / Pro Se Plaintiff*    *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANDRE SUTTON** | : | |
| | : | |
| **v.** | : | |
| | : | **JURY TRIAL DEMANDED** |
| **CITY OF PHILADELPHIA** | : | |
| and | : | Civil Action No. _____ |
| **OFFICER REGINALD GRAHAM,** | : | |
| **(BADGE #6214), individually and** | : | |
| **as a Police Officer for the City of** | : | |
| **Philadelphia,** | : | |
| and | : | |
| **OFFICERCARLOS BUITRAGO,** | : | |
| **(BADGE # unknown), individually** | : | |
| **and as a Police Officer for the City of** | : | |
| **Philadelphia,** | : | |
| and | : | |
| **PHILADELPHIA DISTRICT** | : | |
| **ATTORNEY'S OFFICE,** | : | |
| and | : | |
| **DISTRICT ATTORNEY SETH** | : | |
| **WILLIAMS, individually and as the** | : | |
| **City of Philadelphia District Attorney** | : | |
| and | : | |
| **ASSISTANT DISTRICT ATTORNEY** | : | |
| **JENNIFER LEONARDIS,** | : | |
| **individually and as Assistant District** | : | |
| **Attorney for the City of Philadelphia** | : | |

## COMPLAINT

Plaintiff, Andre Sutton ("Mr. Sutton"), by and through his attorneys, Gay &

Chacker, P.C., hereby asserts the following Complaint against defendants, Police Officer

Reginald Graham ("defendant Graham"), Police Officer Carlos Buitrago ("defendant

Buitrago"), Assistant District Attorney Jennifer Leonardis ("defendant Leonardis"),

District Attorney Seth Williams ("defendant Williams"), the City of Philadelphia

("City"), and the Philadelphia District Attorney's Office ("DAO")(collectively "defendants").

      1.     Plaintiff brings this action under 42 U.S.C. §1983 seeking redress for the extraordinary misconduct of the two Philadelphia Police Officer defendants, in particular, the arresting police officer in this case, defendant Graham, as well as the actions or inaction of his fellow officer, defendant Buitrago, who in order to make their case against Mr. Sutton fabricated and misrepresented the information provided to authorities and in Court under oath which was used as a basis for probable cause to arrest and prosecute Mr. Sutton.

      2.     The actions and conduct of the defendant officers were the result of policies, practices, customs, and deliberate indifference on the part of defendant City of Philadelphia, including the failure to take disciplinary and remedial action against the defendant officers and other Philadelphia police officers despite documented records of misconduct and abuses of authority.

      3.     Plaintiff also seeks redress for the intentional withholding of exculpatory evidence on the part of defendant Leonardis that resulted in plaintiff's wrongful conviction and unlawful imprisonment.  Defendant Leonardis knew that defendant officer Graham, prior to bringing charges and testifying against Mr. Sutton, engaged in corrupt and dishonest conduct in connection with his official duties.  Further, upon information and belief, defendant Leonardis knew that defendant Graham was on a "Do Not Call List" secretly maintained by the DAO that identified officers who had previously engaged in corrupt and dishonest conduct.  The  suppression of this exculpatory evidence was the result of policies, practices, customs, and deliberate indifference on the part of

defendants City of Philadelphia, defendant District Attorney Seth Williams and the

Philadelphia District Attorney's Office including the deliberate and widespread practice

of withholding such exculpatory evidence from citizens charged with criminal offenses.

### Jurisdiction

4.      This action is brought pursuant to 42 U.S.C. §1983. Jurisdiction is

founded upon 28 U.S.C. §§1331 and 1343(1), (3), (4) and the aforementioned statutory

provision.  Plaintiff further invokes the supplemental jurisdiction of this Court under 28

U.S.C. §1367(a) to adjudicate state law claims.

### Parties

5.      Plaintiff Andre Sutton is an adult resident of Philadelphia, Pennsylvania.

6.      Defendant City of Philadelphia is a municipality of the Commonwealth of

Pennsylvania and owns, operates, manages, directs and controls the Philadelphia Police

Department, which employs Defendants Graham and Buitrago.  The City also owns,

operates, manages, directs and controls the Philadelphia District Attorney's Office, which

employs defendants Williams and Leonardis.

7.      At all relevant times, defendants Graham and Buitrago (hereinafter "the

defendant officers") were police officers for the Philadelphia Police Department,

assigned to the narcotics unit, and acting under color of state law. The defendant officers

are being sued in their individual and official capacities.

8.      Defendant DAO is responsible for the prosecution of criminal cases in the

City of Philadelphia and employs, trains and supervised the attorneys assigned to the

prosecution of criminal cases, including defendant Leonardis.

9.      At all relevant times, defendant Williams was the Philadelphia District Attorney acting under color of state law.  Defendant Williams is being sued in his individual and official capacity as District Attorney of Philadelphia.

10.     At all relevant times, defendant Leonardis was an Assistant District Attorney for the City of Philadelphia's District Attorney's Office acting under color of state law.  Defendant Leonardis is being sued in her individual capacity and her official capacity as Assistant District Attorney.

11.     At all relevant times, all defendants were acting in concert and conspiracy and their actions deprived the plaintiff of his constitutional and statutory rights.

12.     At all times relevant to this Complaint, all defendants acted under color of state law.

## Factual Allegations

### Defendant Graham's History of Corruption and Misconduct

13.     For more than twenty years, Philadelphia police officers assigned to various narcotics units have engaged in a pattern and practice of securing search warrants based on fraud and misrepresentation, the misuse of informants, the improper execution of search warrants, the falsification of evidence, the destruction and theft of personal property, improper use of force, coercion and related misconduct.

14.     In December 2013, defendant Graham himself became the subject of a federal investigation into police wrongdoing and corruption involving himself and several members of his Narcotic Field Unit (NFU) squad he worked since September 2000.

15.     According to an Internal Affairs Division (IAD) investigation, defendant Graham went to the Federal Bureau of Investigation (FBI), unsolicited, on November 25,

2013 to provide his knowledge regarding his fellow NFU police officers under investigation for several alleged crimes against citizens who were targeted by these NFU officers employing various unconstitutional acts including but not limited to robbery, excessive force, unlawful arrests and perjury. A true and correct copy of IAD investigation #14-1404 is attached hereto as Exhibit "A".

16.     Unbeknownst to defendant Graham at the time of the federal investigation he was himself implicated as a party to criminal conduct by former police officer Jeffrey Walker.

17.     Jeffrey Walker alleged that defendant Graham participated in stealing money during a drug investigation of a house at 7408 Brockton Road, Philadelphia, PA on January 21, 2005 where defendant Graham was acting as lead investigator.

18.     Jeffrey Walker, who became a cooperating witness for the federal government in 2014, stated that he participated in stealing money with defendant Graham on narcotic investigations when they worked together in the NFU squad.

19.     Specifically, in the Brockton Road job, Jeffrey Walker stated that defendant Graham and Walker searched a vehicle where Walker found money in the trunk of the vehicle and gave a portion of the money to defendant Graham. Jeffrey Walker further informed the authorities that defendant Graham and Walker split the money stolen from the trunk of the vehicle.

20.     In 2014, defendant Graham was interviewed by a federal Polygraph Examiner who administered a polygraph examination of defendant Graham concerning an investigation of 5 former partners who defendant Graham worked with in the NFU squad, including Jeffrey Walker, the Sergeant and the two police officers involved in the

Brockton road job who were in the room with the Sergeant counting the money that was turned in that day. A true and correct copy of the Polygraph Examination Report is attached as Exhibit "B".

21.     During the Polygraph Examination, defendant Graham was asked the following questions: "A. Did you steal that money from Brockton Road? B. Did you take that money from Walker?" Defendant Graham answered "No" to both questions.

22.     Defendant Graham failed the Polygraph Examination where the investigator indicated "Deception Indicated" for both answers and Defendant Graham thereafter admitted that he lied.

23.     On October 28, 2016, the Philadelphia Police Department charged defendant Graham with "Conduct Unbecoming" by engaging in any action that constitutes the commission of a felony or misdemeanor and "Conduct Unbecoming" by lying or attempting to deceive regarding a material fact during the course of any Departmental Investigation. A true and correct copy of the Police Board of Inquiry ("PBI") Statement of Charges Filed and Action Taken is attached hereto as Exhibit "C".

24.     A PBI hearing was held on March 8, 2017 whereby defendant Graham was found guilty on all charges.

25.     Defendant Graham's employment with the Philadelphia Police Department was terminated.

26.     Upon information and belief, defendants Williams, the DAO and defendant Leonardis knew prior to Mr. Sutton's prosecution and/or conviction in September 2014 that defendant Graham had engaged or was alleged to have engaged in the above corrupt and dishonest conduct.

## The DAO's Secret Do Not Call List

27.     On March 6, 2018, the DAO, under Court Order to do so, released the "Do Not Call List", which was a secretly-maintained list of Philadelphia police officers whom prosecutors sought to keep off the witness stand based on a history of dishonesty and corruption.

28.     Upon information and belief, the Do Not Call List was created prior to Mr. Sutton's conviction by, at the direction of, or with the knowledge and approval of defendant Williams.

29.     The Do Not Call List placed each officer listed in one of three categories: (1) those who engaged in serious misconduct such that they could not be called as a witness without explicit permission from the First District Attorney, (2) those who could be used as a witness but the defense attorney was to be informed of the officer's misconduct and (3) those who could be called as a witness but the prosecutor was to be aware of the misconduct.

30.     Defendant Graham was on the Do Not Call List and was placed in the most serious category such that he could not be called as a witness without the express written approval of the First Assistant District Attorney.

## Mr. Sutton's Unlawful Arrest, Imprisonment and Prosecution

31.     On January 23, 2014, Mr. Sutton was arrested and charged with various drug-related offenses based on defendant Graham's false assertion that Mr. Sutton was observed participating in drug transactions with confidential informants on January 14, 2014 and January 22, 2014.

32.     Defendant Buitrago participated in the false arrest, imprisonment, and prosecution of Mr. Sutton knowing that the allegations against Mr. Sutton were fabricated.

33.     Mr. Sutton has maintained his innocence from the date of his arrest on January 23, 2014 until the charges against him were dismissed on May 10, 2019.

34.     The defendant officers gave false statements concerning the incident described in the complaint.

35.     Subsequent to the unlawful detention and arrest of Mr. Sutton, defendants prepared and caused to be prepared police paperwork intentionally misrepresenting the events that led to the arrest of Mr. Sutton.  These misrepresentations were intentional, malicious, in bad faith, deliberately indifferent and recklessly indifferent to Mr. Sutton's rights.

36.     The defendant officers were aware of exculpatory information about Mr. Sutton.

37.     The defendant officers failed to provide exculpatory information known to them to Mr. Sutton or his criminal counsel.

38.     The exculpatory information known to police that was not provided to Mr. Sutton included the real facts and circumstances of the incident.

39.     The misrepresentations contained in the affidavit of probable cause, arrest report and property receipts were material to the probable cause determination of the arrest; indeed, without these allegations, the probable cause required for Mr. Sutton's arrest contain no cause or reason to warrant the arrest and/or prosecution.

40.    The defendant officers provided prosecutors from the DAO with false, misleading, and incomplete information regarding their investigation in this case in an effort to obtain the DAOs approval for Mr. Sutton's prosecution.

41.    The actions of the defendant officers in submitting materially false information was part of a practice and custom of the defendant officers and other officers in the Philadelphia Police Department to secure search warrants and prepare arrest reports based on false information.

42.    The defendant officers disregarded proper police practices regarding the preparation of post arrest documentation and these actions led to the improper conduct in this case.

43.    At no time during the incident described in this complaint did Mr. Sutton violate the laws of Pennsylvania or any other jurisdiction as described in the bogus paperwork prepared by the defendant police officers.

44.    A preliminary hearing was held on March 26, 2014, at which time the charges against Mr. Sutton were held for court based entirely on the false testimony of defendant Graham.

45.    Defendant Leonardis prosecuted the case against Mr. Sutton on behalf of the DAO.

46.    On September 16, 2014, following a non-jury trial, Mr. Sutton was convicted of the drug-related offenses based on the intentionally false testimony of defendants Graham and Buitrago.

47.     On November 24, 2014, Mr. Sutton was sentenced to two concurrent terms of eleven and one-half to twenty-three months imprisonment as well as five years probation.

**Mr. Sutton is Granted a New Trial and the
Charges Against Him Are *Nolle Prossed* After Defendant
Graham's Corrupt Behavior and the Do Not Call List Are Publicly Disclosed**

48.     On March 6, 2018, the Do Not Call List was released by the Philadelphia District Attorney's Office and made publically available for the first time.

49.     On March 28, 2019, Mr. Sutton's criminal defense attorney filed a motion for a new trial/PCRA/writ of habeas corpus asserting that Mr. Sutton was entitled to a new trial based on the prosecution's withholding of exculpatory evidence that defendant Graham was on the Do Not Call List for having previously engaged in corrupt and dishonest conduct in connection with his duties as a police officer.

50.     On May 10, 2019, Mr. Sutton was granted a new trial and the District Attorney's motion to *nolle prosse* all the charges was granted.

51.     The charges against Mr. Sutton were *nolle prossed* because of the defendant officers' history of corruption and dishonest conduct, including fabricating and planting evidence, as well as repeated preparation of bogus paperwork and similar activities.

52.     As a direct and proximate result of the defendants' actions, Mr. Sutton was deprived of rights, privileges and immunities under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution and in particular the right to be free from malicious prosecution, the right to be free from false arrest, the right to be free from false imprisonment, the right to due process of law and the right to a fair trial.

53.     The actions and/or inactions of the defendants violated the clearly established federal constitutional rights of Mr. Sutton to freedom from malicious prosecution, the right to be free from false arrest, the right to be free from false imprisonment, the right to due process of law and the right to a fair trial.

54.     The defendant officers, acting in concert and conspiracy, caused Mr. Sutton to be unlawfully arrested, prosecuted and imprisoned by falsifying information and fabricating evidence to support the claim that Mr. Sutton was involved in criminal activity, and failing to disclose exculpatory evidence.

55.     Defendant Leonardis, acting pursuant to the widespread practice of the DAO of withholding exculpatory evidence, including but not limited to evidence of the Do Not Call List, caused Mr. Sutton to be unlawfully imprisoned by intentionally failing to disclose that defendant Graham had previously engaged in corrupt and dishonest behavior in connection with his duties as a police officer and was on the Do Not Call List.

56.     The unlawful arrest, prosecution and detention of Mr. Sutton was the direct result of all defendants' pattern, practice and custom of subjecting citizens such as Mr. Sutton to arrest, prosecution and detention without probable cause and without disclosing exculpatory evidence so as to deprive citizens such as Mr. Sutton of their due process rights and their right to a fair trial.

57.     The defendants acted willfully, deliberately, maliciously or with reckless disregard of Mr. Sutton's constitutional and statutory rights.

58.     As a direct and proximate result of the actions of all defendants, Mr. Sutton suffered and continues to suffer physical and psychological harms, pain and

suffering, damage to reputation, some or all of which may be permanent, as well as financial losses.

59.     As a direct and proximate result of the actions of all defendants, Mr. Sutton spent in excess of five years unlawfully incarcerated.

60.     As a direct and proximate result of the actions of all defendants, on or about February 6, 2016, while serving his sentence at Cambria Community Center, Mr. Sutton was caused to fall while getting out of the shower due to a dangerously wet floor and sustained severe and permanent injuries and disfigurement including a fractured wrist a various other ills.

61.     All defendants engaged in the aforesaid conduct for the purpose of violating Mr. Sutton's constitutional rights by subjecting him to unlawful arrest, prosecution and prolonged detention.

62.     The actions and conduct of the defendant officers and defendant Leonardis were caused by a policy, practice and custom of defendant City of Philadelphia and/or the DAO of failing, with deliberate indifference, to supervise, monitor, and properly train narcotics officers and/or attorneys in the DAO with respect to (a) their duty to provide only truthful information in securing search and arrest warrants, (b) their duty to ensure that relationships and dealings with confidential informants are in accord with Police Department policy and constitutional commands, (c) their duty to disclose exculpatory evidence in criminal cases, (d) their duty not to undertake arrests in the absence of lawful grounds, (e) their duty to provide accurate and truthful information to the prosecutor's office, (f) their duty to report and disclose misconduct and illegal actions of other police

officers, and (g) the fabrication of evidence against an accused to justify their illegal actions and conduct.

63.     The failure of defendants City of Philadelphia and DAO to properly train and supervise officers and attorneys regarding their duty to disclose exculpatory evidence resulted in a widespread pattern of *Brady* violations such that upon public disclosure of the Do Not Call List the Commonwealth agreed to dismiss over 1500 criminal convictions that were based on testimony of police officers considered not credible, including Mr. Sutton's conviction.

64.     Defendant City of Philadelphia has failed to properly discipline the defendant officers and other officers in the Police Department in cases involving violations of rights of civilians, including cases of improper arrests and prosecutions, thereby causing the violations in this case.

65.     Defendants City of Philadelphia, DAO and Williams failed to properly discipline defendant Leonardis and other attorneys in the DAO in cases involving suppression of exculpatory evidence, thereby causing the violations in this case.

66.     The above described actions of all of the defendants caused the violations of the plaintiffs' rights under the Fourth, Fifth and Fourteenth Amendment as alleged in this Complaint.

**COUNT ONE**
**42 U.S.C. § 1983 against defendants Graham, Buitrago and Leonardis**

67.     Mr. Sutton hereby incorporates by reference paragraphs 1 through 66 of his Complaint as if the same were set forth at length herein.

68.     As a direct and proximate result of all defendants' conduct, committed under color of state law, Mr. Sutton was deprived of the right to be free from unlawful

detention, the right to be free of false arrest, the right to be free of false imprisonment, the

right to be free of malicious prosecution, the right to due process of law and the right to a

fair trial. As a result, Mr. Howard suffered and continues to suffer harm in violation of

his rights under the laws and Constitution of the United States, in particular the Fourth,

Fifth and Fourteenth Amendments, and 42 U.S.C. §1983.

69.     As a direct and proximate result of the acts of all defendants, Mr. Sutton

sustained injuries, emotional harm, loss of liberty and financial losses, all to his detriment

and harm.

70.     The actions of the defendants were so malicious, intentional and reckless,

and displayed such a reckless indifference to Mr. Sutton's rights and well-being that the

imposition of punitive damages is warranted.

## COUNT TWO
### Supplemental State Claims Against defendants Graham, Buitrago and Leonardis

71.     Mr. Sutton hereby incorporates by reference paragraphs 1 through 70 of

his Complaint as if the same were set forth at length herein.

72.     The acts and conduct of the defendants Graham, Buitrago and Leonardis

in this cause of action constitute false arrest/false imprisonment, malicious prosecution,

negligent infliction of emotional distress, outrageous conduct causing emotional distress,

defamation, abuse of process and invasion of privacy – casting in false light under the

laws of the Commonwealth of Pennsylvania, and this Court has supplemental jurisdiction

to hear and adjudicate these claims.

73.     Defendants Graham, Buitrago and Leonardis, acting in concert and

conspiracy, committed acts in violation of Mr. Sutton's Constitutional Rights and against

the laws of Pennsylvania.  The defendants made statements among themselves and others

in order to conceal their unlawful and unconstitutional conduct and in an attempt to deny plaintiff's access to the courts and to due process and to cover-up the wrongful arrest, prosecution and imprisonment of Mr. Sutton.

74.     Defendants performed overt acts in furtherance of the conspiracy.

75.     As a direct and proximate result of the acts of all defendants, Mr. Sutton sustained injuries, emotional harm, loss of liberty and financial losses, all to his detriment and harm.

76.     The actions of the defendants were so malicious, intentional and reckless, and displayed such a reckless indifference to Mr. Sutton's rights and well-being that the imposition of punitive damages is warranted.

**COUNT THREE**
**Bystander Liability**
**42 U.S.C. § 1983 Against Defendants Graham and Buitrago**

77.     Mr. Sutton hereby incorporates by reference paragraphs 1 through 76 of his Complaint as if the same were set forth at length herein.

78.     Plaintiff believes and therefore avers that defendant police officers encouraged and stood idly by while Mr. Sutton was unlawfully arrested, prosecuted and imprisoned.

79.     By encouraging and failing to intervene, the defendant police officers effectively assisted each other in unlawfully arresting, prosecuting and imprisoning Mr. Sutton and therefore deprived Mr. Sutton of his Constitutional rights and privileges under the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States and were in violation of 42 U.S.C. Section 1983.

80.     The defendant police officers made statements among themselves and others in order to conceal their unlawful and unconstitutional conduct and in an attempt to deny plaintiff's access to the courts and to due process and to cover-up the wrongful arrest, prosecution and detention of Mr. Sutton.

81.     Each defendant police officer had an affirmative duty to prevent the unlawful arrest, prosecution and imprisonment of Mr. Sutton.

82.     Each of the defendant police officers had an opportunity to intervene to prevent the unlawful and illegal arrest, prosecution and imprisonment of Mr. Sutton and failed to fulfill their obligation.

83.     As a result of the above actions, Mr. Sutton suffered the damages as aforesaid.

84.     The actions of the defendant police officers were so malicious, intentional and reckless, and displayed such a reckless indifference to Mr. Sutton's rights and well-being that the imposition of punitive damages is warranted.

## COUNT FOUR
### 42 U.S.C. § 1983 Against Defendants City of Philadelphia, DAO and Williams

85.     Mr. Sutton hereby incorporates by reference paragraphs 1 through 84 of his Complaint as if the same were set forth at length herein.

86.     Defendant City of Philadelphia has encouraged, tolerated, ratified and has been deliberately indifferent to the following patterns, practices and customs and to the need for more or different training, supervision, investigation or discipline in the areas of:

   a.  Unlawful detentions and unlawful arrests by police officers;

   b.  The proper exercise of police powers, including but not limited to the use of false information to obtain search warrants, fabrication of

evidence, unlawful arrest, malicious prosecution and unlawful detention;

   c.  The monitoring of officers whom it knew or should have known were suffering from emotional and/or psychological problems that impaired their ability to function as officers;

   d.  The failure to identify and take remedial or disciplinary action against police officers who were the subject of prior civilian or internal complaints of misconduct;

   e.  Police officers' use of their status as police officers to employ the use of unlawful search and/or arrest, or to achieve ends not reasonably related to their police duties;

   f.  Police officers' use of their status as police officers to employ the use of unlawful arrest, invoke the Code of Silence, or to achieve ends not reasonably related to police duties;

   g.  The refusal of police officers to intervene when other officers violate the rights of citizens in their presence;

   h.  The failure to identify and take remedial or disciplinary action against units of officers assigned to narcotics investigations in light of repeated instances of misconduct over a period of many years as alleged in this Complaint; and

   i.  The refusal of police officers to report or provide information concerning the misconduct of other police officers, a custom or practice known as the "Code of Silence."

87.   Defendant City of Philadelphia failed to properly train, supervise or discipline officers assigned to narcotics units of the Philadelphia Police Department who have engaged over a period of many years in systematic abuses of authority, including but not limited to: (a) the duty to disclose exculpatory evidence in criminal cases, (b) their duty not to undertake arrests in the absence of lawful grounds, (c) the duty to provide accurate and truthful information to the prosecutor's office, (d) the duty to report and disclose misconduct and illegal actions of other police officers, and (e) the fabrication of evidence against an accused to justify their illegal actions and conduct.

88.     Defendant City of Philadelphia failed to properly sanction or discipline officers, who are aware of and conceal and/or aid and abet violations of constitutional rights of individuals by other Philadelphia Police Officers, thereby causing and encouraging Philadelphia police, including the defendant officers in this case, to violate the rights of citizens such as Mr. Sutton.

89.     Defendant City of Philadelphia is deliberately indifferent to the need to train, supervise and discipline police officers. The Internal Affairs Division (IAD) of the Philadelphia Police Department (PPD) fails to provide an internal disciplinary mechanism that imposes meaningful disciplinary and remedial actions in the following respects:

    a.  There are excessive and chronic delays in resolving disciplinary complaints;

    b.  There is a lack of consistent, rational and meaningful disciplinary and remedial actions;

    c.  There is a failure to effectively discipline substantial numbers of officers who were found to have engaged in misconduct.

    d.  The PPD's internal investigatory process has fallen below accepted practices and is arbitrary and inconsistent;

    e.  The PPD discipline, as practiced, is incident based rather than progressive. Thus, repeat violators are not being penalized in proportion to the number of violations.

    f.  The conduct of IAD investigations demonstrates that PPD internal affairs personnel are not adequately trained and supervised in the proper conduct of such investigations;

    g.  A global analysis of IAD's investigatory procedures indicates a pattern of administrative conduct where the benefit of the doubt is given to the officer rather than the complainant;

    h.  There are serious deficiencies in the quality of IAD investigations and the validity of the IAD findings and conclusions;

    i.   The PPD lacks an effective early warning system to identify, track and monitor "problem" officers.

    j.   Despite the fact that several of the defendant officers had amassed an exceptionally large number of serious misconduct complaints, the officers stayed well below the radar of an early warning system;

    k.   Despite numerous prior complaints against several of the defendant officers, the PPD took no meaningful disciplinary or remedial actions;

    l.   Despite numerous prior complaints against several of the defendant officers, the PPD took no meaningful steps to more closely monitor, retrain and supervise the officers;

    m.  IAD frequently fails to interview available eyewitnesses to incidents involving citizen complaints of misconduct. The interviews that are conducted by IAD are below acceptable standards of police practice and fail to address key issues in the cases; and

    n.   IAD fails to acknowledge the disproportionate and extreme use of force used by police officers in the investigation of citizen complaints and fails to properly categorize the police officers' misconduct in those cases as an impermissible use of force.

90.    Prior to January 23, 2014, defendants City of Philadelphia, DAO and Williams developed and maintained polices and/or customs exhibiting deliberate indifference to the constitutional rights of persons accused of crimes to disclosure of exculpatory evidence, which caused the violation of Mr. Sutton's rights.

91.    It was the policy and/or custom of the City of Philadelphia, DAO and Williams to cover-up and conceal evidence that police officers had previously engaged in corrupt and dishonest acts in connection with their official duties.

92.    It was the policy and/or custom of the City of Philadelphia, DAO and Williams to inadequately supervise and train attorneys employed in the DAO, including defendant Leonardis, regarding their obligation to disclose exculpatory evidence to

persons charged with criminal offenses, thereby failing to adequately discourage further constitutional violations on the part of attorneys employed in the DAO.

93.     As a result of the above described policies and customs, attorneys in the DAO were instructed or encouraged to systematically violate the rights of persons accused of criminal offenses, and in particular to suppress evidence that testifying police officers had engaged in corrupt and dishonest conduct in connection with their official duties and were not credible, resulting in a pattern of illegal and improper convictions, believed to be in excess of 1500 cases, that were subsequently dismissed after publication of the Do Not Call List and after wrongfully accused persons such as Mr. Sutton served substantial periods of incarceration.

94.     Defendants have by the above described actions deprived the plaintiff of rights secured by the Fourth, Fifth and Fourteenth Amendments to the United States Constitution in violation of 42 U.S.C. §1983.

95.     As a result of the above actions, Mr. Sutton suffered the damages as aforesaid.

96.     The actions of defendants City of Philadelphia, DAO and Williams were so malicious, intentional and reckless, and displayed such a reckless indifference to Mr. Sutton's rights and well-being that the imposition of punitive damages is warranted.

WHEREFORE, the plaintiff requests the following relief:

    a.   Compensatory damages as to all defendants;

    b.   Punitive damages as to the individual defendants;

    c.   Reasonable attorney's fees and costs as to all defendants;

    d.   Such other declaratory and further relief as appears reasonable and just; and

    e.   A jury trial as to each defendant and as to each count.


BRIAN S. CHACKER, ESQUIRE
JAMES A. WELLS, ESQUIRE
GAY & CHACKER, P.C.
1731 Spring Garden Street
Philadelphia, PA  19130
(215) 567-7955
fax: (215) 567-6809
brian@gayandchacker.com
james@gayandchacker.com

**Attorneys for Plaintiff
Andre Sutton**

Date:  March 4, 2020

*MEMORANDUM*

**POLICE**
CITY OF PHILADELPHIA
Date: 09-16-16

TO        : Police Commissioner

FROM    : Commanding Officer, Investigative Support Services

SUBJECT: **INTERNAL INVESTIGATION: IAD #14-1404**

### ALLEGATION

During the federal investigation of former Narcotics Field Unit (NFU) officers,
Thomas Liciardello, Brian Reynolds, Michael Spicer, Perry Betts, Linwood
Norman, and John Speiser, P/O Reginald Graham #6214, NFU, became a target of a
federal criminal investigation. On 06-02-14, the Office of Professional
Responsibility (OPR) was notified that P/O Graham was the target of a federal
criminal investigation and IAD #14-1404 was issued.

A check of the Department's Personnel Database indicates that P/O Reginald
Graham #6214, PR#220827, was appointed on 03-06-95, and assigned to the NFU,
on 09-25-00.

Sgt. Gerard J. Deacon #835, IAD/PPCTF, was assigned the administrative investigation. On
01-22-16, the investigation was reassigned to Sgt. Chester O'Neill #8785, IAD/PPCTF.

### INVESTIGATIVE ANALYSIS

During the federal investigation of the former NFU officers, P/O Graham, unsolicited,
came to the FBI on 11-25-13, to provide his knowledge of the officers who were under
investigation. Unknown to P/O Graham, during several prior proffer agreement interviews
of former P/O Jeffrey Walker, P/O Graham was implicated as being a party to criminal
conduct.

Specifically, P/O Walker alleged that he participated in stealing money on NFU
investigations with P/O Graham. P/O Walker alleged he and P/O Graham were involved in
a search of a vehicle and a house on Brockton Road (DC# 05-19-004239). P/O Walker
alleged he found money in the trunk of the vehicle and gave a portion of it to P/O Graham.
In a second incident, P/O Walker alleged he and P/O Graham were in a house and they
found a shoebox full of money. P/O Walker alleged that he and P/O Graham split the
money.


EXHIBIT
4

At the conclusion of the NFU criminal trial, and for the purpose of IAD administrative investigations, the assigned interviewed P/O Walker, on 06-29-15, about an array of things that he spoke about in proffer sessions. In regard to this investigation, P/O Walker stated he and P/O Graham were involved in a search of a vehicle from a property on Brockton Road.

The man associated with the vehicle and property was arrested, and the property was also searched. A large amount of money was found in the trunk of the vehicle and it was taken into Sgt. Chet Malkowski's office. P/O Walker stated he found another bag of money in the trunk of the car. P/O Walker took that money and split it with P/O Graham at the back of the car. P/O Walker stated he and P/O Graham then went up to the office and took the rest of the money up there. P/O Graham gave the money to Sgt. Malkowski. P/O Liciardello and P/O Reynolds then went into Sgt. Malkowski's office and closed the door. P/O Walker stated he also gave some money to (former P/O) Lou Cujdik Sr.

In response to questions, P/O Walker stated he did not give any money to P/O Graham at a Sunoco station later that night. P/O Walker did not remember how much money he gave P/O Graham or Lou Cujdik Sr. P/O Walker stated there was another time when he took money and split it with P/O Graham. P/O Walker said it was a small amount of money, and he did not remember where or when he allegedly gave them the money.

In an interview with the FBI, on 11-25-13, P/O Graham was asked about the allegations made by P/O Walker. P/O Graham denied that he ever took money on the Brockton Road job, or any other job.

As the federal investigation of the former NFU officers continued, P/O Graham kept in contact with FBI agents. On 05-14-14, while in the office of the FBI, agents asked P/O Graham if he would be willing to submit to a polygraph examination. P/O Graham agreed. P/O Graham was immediately administered "Miranda Rights" and was interviewed by the polygraph examiner, S/A Thomas Scanzano. Following the interview, S/A Scanzano administered the polygraph examination. P/O Graham failed the polygraph examination.

In a post examination interview conducted by S/A Scanzano, P/O Graham stated he lied to Scanzano because he was afraid of the repercussions. P/O Graham faced the possibility of being charged with 18 U.S.C. § 1001, making false statements to a federal agent. P/O Graham went on to describe what occurred before the Brockton Road job, where they found a shoebox full of money. P/O Graham referred to it as the "███████ job." P/O Graham stated approximately one week after that job, he received a phone call from P/O Walker. P/O Walker asked Graham to meet him at a Sunoco gas station. P/O Walker arrived and handed P/O Graham an envelope and drove off. P/O Graham stated there was money in the envelope and he assumed it was money from the ███████ job. P/O Graham stated he did not keep the money, but he threw it in the trash instead.

On 06-02-14, the assigned notified OPR that P/O Reginald Graham #6214, NFU, became a target of an ongoing federal investigation that involved other former members of the NFU. As a result, OPR ordered that P/O Graham be detailed to the Police Impound Lot.

P/O Graham was not criminally charged by the United States Attorney's Office (USAO) for the Eastern District of Pennsylvania (EDPA) or by the Philadelphia District Attorney's Office, Special Investigations Unit. On 12-08-15, the United States Attorney's Office (USAO) issued a declination of charges letter. On 4-13-16, the Philadelphia Attorney's Office issued a declination of charges letter to the Philadelphia Police Department, Internal Affairs Division.

P/O Reginald Graham #6214 was interviewed on 6-22-16, by the assigned inside IAD Headquarters. P/O Graham stated he agreed to take a polygraph test and give a voluntary statement to the FBI, during the federal investigation of former P/O Walker and other members of the Narcotics Field Unit.

P/O Graham stated before he spoke to the FBI in 2014, he spoke to an investigator at IAB sometime in 2003 or 2004 about P/O Liciardello, P/O Reynolds, and P/O Walker. P/O Graham stated he went to Internal Affairs to give a statement regarding a complaint against the three officers, but not to report corruption. P/O Graham stated he told the IAB investigator that he was tired of coming to IAB because of complaints and lawsuits. P/O Graham stated he told the IAB investigator he was only back-up officer, and he had nothing to do with the probable cause that led to the actual arrest.

P/O Graham stated he was immediately contacted by Sgt. Malkowski after leaving IAD. P/O Graham stated Sgt. Malkowski questioned him about what he said at IAD, and he let him know he already knew what he said at IAD. P/O Graham stated he believed Sgt. Malkowski told P/O Reynolds and P/O Liciardello what he said at IAD, because the next time he met with P/O Liciardello and P/O Reynolds they gave him and his partner the cold shoulder. P/O Graham stated P/O Liciardello called him a "Snitch."

P/O Graham stated he confided in Cpl. Larry McKinney, about his concerns regarding P/O Liciardello, P/O Reynolds, and P/O Walker's relationship with Sgt. Malkowski. P/O Graham stated he told Cpl. McKinney the three officers' jobs were shady. P/O Graham stated approximately three months after Cpl. McKinney had come to the squad, Cpl. McKinney divulged what P/O Graham had previously told him about the three officers. P/O Graham stated when he returned to work the next day, he and his partners had an argument with P/O Liciardello and P/O Reynolds about what he said to Cpl. McKinney three months earlier. P/O Graham stated P/O Liciardello and P/O Reynolds told him, P/O Mike Williams, and P/O Barry Clahar, they knew a lot of people and they would have them fired.

P/O Graham stated he met with City Solicitor, Jean Durbin, about a lawsuit filed by Gregory and Raymond Randle against P/O Liciardello, P/O Reynolds, and P/O Walker. P/O Graham stated he told her, he did not want to be a part of their cases and he did not want to be associated with them, because of the number of lawsuits they were involved in. P/O Graham stated while returning to City Hall to punch out, he received a call from Sgt. Malkowski. P/O Graham stated Sgt. Malkowski told him he knew what he said during the meeting with the City Solicitor.

3

P/O Graham stated when he was called to take the stand in the Randle lawsuit, which he was named as a defendant; he took the opportunity to separate himself from the other officers.

P/O Graham stated the Judge hearing the case, after hearing P/O Graham's testimony, dismissed him not only from the Randle case, but also from 14 other pending lawsuits. P/O Graham stated after being excused from the lawsuits, a change occurred at the unit. P/O Graham stated his cases were put on the back burner, and he did not receive recognition for his work; while P/O Liciardello, P/O Reynolds, and P/O Walker were constantly put in for awards. P/O Graham stated he felt he had no other options for reporting the three officers, because Sgt. Malkowski's cousin was now his Captain.

P/O Graham stated after the Randle lawsuit, Sgt. Malkowski made P/O Walker work and ride with him. P/O Graham stated he never worked with P/O Walker before, and he felt it was Sgt. Malkowski's way of keeping an eye on him. P/O Graham stated P/O Walker told him that P/O Liciardello and P/O Reynolds were upset with him, about the Randle lawsuit, and all of the other things that transpired. P/O Graham stated P/O Walker told him to be careful who he talked to. P/O Graham stated after his conversation with P/O Walker, he was cautious, he changed his routine, and he took different routes home from work.

P/O Graham stated he had a few incidents after being warned by P/O Walker. P/O Graham stated someone punctured all four of his car tires, and someone cracked all of the windows in his apartment. P/O Graham stated he never reported the incidents, because he feared that no matter who he spoke to, it would get back to P/O Liciardello, P/O Reynolds, and P/O Walker. P/O Graham stated it was at about this time that P/O Liciardello and P/O Reynolds were removed from the street.

P/O Graham stated he approached Sgt. Kimberly Byrd, who at the time was the Police Commissioner's Aide, and he voiced his concerns that all P/O Liciardello's cases referred to a black bag in their probable cause. P/O Graham stated he also expressed a desire to leave the squad. P/O Graham stated after speaking to Sgt. Byrd, P/O Liciardello and P/O Reynolds were removed from the street and assigned to the Operations Room. P/O Graham stated even though P/O Liciardello and P/O Reynolds worked in the Operations Room, they made just as much overtime as they did working the street.

P/O Graham stated Sgt. Byrd called him when P/O Liciardello and P/O Reynolds returned to street duty. P/O Graham stated he felt the conversation was to warn him that they were coming back and to be careful. P/O Graham stated he believed that Sgt. Byrd believed that P/O Liciardello and P/O Reynolds were good guys. P/O Graham stated he felt that nothing was going to be done, even after everything he told Sgt. Byrd. P/O Graham stated after P/O Liciardello and P/O Reynolds returned to the street, he felt that Sgt. Malkowski tried to involve P/O Liciardello and P/O Reynolds in his federal case. P/O Graham stated he was able to keep them out of the case with the help of DEA and the FBI.

P/O Graham stated he told Lt. Wixted and Sgt. Meehan, when they broke up the squad, that it might be a problem if P/O Walker transferred to their squad. P/O Graham stated he did not give them details because he did not know who he could trust. P/O Graham stated that P/O Walker ended up in his squad a few years later.

P/O Graham stated he had a conversation with Deputy District Attorney (DDA), Curtis Douglas about a case he referred to as "▓▓▓▓▓▓▓▓" P/O Graham stated DDA Douglas asked if he could use P/O Liciardello, P/O Reynolds, and P/O Walker on the case. P/O Graham stated he told DDA Douglas not to use them on the case, and he told DDA Douglas all of his other concerns about them.

P/O Graham stated he told DDA Douglas that he wanted to disassociate himself from them. P/O Graham stated at the time of this conversation, he was working on a federal case. P/O Graham stated it gave him the opportunity to get away from P/O Liciardello, P/O Reynolds, and P/O Walker, who had already been returned to street duty. P/O Graham stated that DDA Curtis Douglas referred him to the FBI.

P/O Graham stated the case, referred to as the "Brockton Road" job, was his case that was adopted by the FBI. P/O Graham stated P/O Walker was assigned to work the case by Sgt. Malkowski. P/O Graham stated he felt P/O Walker was put there to keep an eye on what was going on. P/O Graham stated during this investigation, P/O Liciardello and P/O Reynolds were off the street. P/O Graham stated Sgt. Malkowski tried to include P/O Liciardello and P/O Reynolds in the case by having them transport evidence to the lab that he recovered from a trash pull.

P/O Graham stated a car was confiscated during the "Brockton Road" job. P/O Graham stated the car was transported back to headquarters, while he was already at headquarters preparing a search warrant. P/O Graham stated the car was searched by P/O Jett, P/O Mike Williams, and P/O Walker. P/O Graham stated P/O Jett called him on the phone and told him that P/O Walker had offered him money that was recovered from inside the car. P/O Graham stated P/O Jett told him he refused P/O Walker's offer. P/O Graham stated he then spoke to P/O Walker on the phone, and he told him off. P/O Graham stated P/O Walker responded, "I was just playing with him." P/O Graham stated he told P/O Walker to bring the money upstairs right now. P/O Graham stated he told P/O Walker he didn't care what P/O Walker did on his jobs, but this was a federal job and he was the assigned.

P/O Graham stated P/O Walker brought the money inside to Sgt. Malkowski's office. P/O Graham stated he could not see the inside of Sgt. Malkowski's office, but as soon as the money was brought into the office, P/O Liciardello and P/O Reynolds went inside the office. P/O Graham stated he did not count the money, because he was not allowed in the office. P/O Graham stated he knocked on the office door, but no one answered, so he went back to processing his stuff. P/O Graham stated as a precaution, he changed who the recovering officer of the money was on his PAR's Report. P/O Graham stated he made the recovering officer Sgt. Malkowski, because he counted the money and accepted it from P/O Walker.

P/O Graham stated Sgt. Malkowski gave him a total of $32,000.00. P/O Graham felt that he was being set up, because Sgt. Malkowski told him $32,000.00 was recovered, but he put $34,000.00 on the search warrant. P/O Graham stated he suspected something, because he was never given a breakdown of the money by denomination.

P/O Graham stated he requested an FBI agent come and get the money, because he was not comfortable with the money staying at headquarters. P/O Graham stated the FBI agent's count was $32,252.00.

P/O Graham stated the FBI questioned him specifically on the "Brockton Road" job, and he vehemently denied ever taking anything on that investigation. P/O Graham stated he received an envelope from P/O Walker, but it had nothing to do with the investigation known as the "Brockton Road" job. P/O Graham stated he believed that the FBI focused on that investigation based on information provided to them by P/O Walker.

P/O Graham stated P/O Walker gave him an envelope while he was at the Sunoco Station, located at 28th St. & Passyunk Ave. P/O Graham stated he believed P/O Walker set him up, because he felt he was being watched by unknown person(s) in a Chevrolet Impala, painted silver with tinted windows, parked in front of the bar located across the street from the Sunoco Station. P/O Graham stated after he took the envelope from P/O Walker, he threw the unopened envelope in the Sunoco Station trash can. P/O Graham stated he never reported the incident, because he felt no one would believe him. P/O Graham denied ever taking or receiving money from P/O Walker that was recovered from the trunk of a car related to the "Brockton Road" job.

P/O Graham denied any knowledge of the case, referred to as the "Shoebox" case. P/O Graham denied he was asked anything about a "Shoebox" case during the polygraph test. P/O Graham stated he felt very nervous during the polygraph test, because Sgt. Deacon revealed to him before the polygraph test, during a preliminary interview, that Sgt. Deacon worked at the Narcotics Unit for several years, and he knew and worked with Sgt. Malkowski, Lt. Wixted, and several other supervisors that are still assigned there.

P/O Graham stated he felt that his cooperation with the FBI was going to get back to his unit. P/O Graham stated he later learned that his former partner somehow knew he was interviewed by the FBI, took a polygraph test, and was asked to wear a wire against fellow officers. P/O Graham stated he had concerns about leaks that caused him problems in the past. P/O Graham stated he did not report any corruption because he felt no one would believe him and he did not know who to trust.

Chester O'Neill
Sergeant #8785
IAD/PPCTF

Charles R. Vogt
Captain #115
Investigative Support Services

7

## CONCLUSION

The allegation that P/O Reginald Graham #6214, Payroll #220827, Narcotics Field Unit, engaged in criminal conduct is **SUSTAINED**.

The allegation that P/O Reginald Graham #6214, Payroll #220827, Narcotics Field Unit, committed theft is **SUSTAINED**.

The allegation that P/O Reginald Graham #6214, Payroll #220827, Narcotics Field Unit, lied during this investigation is **SUSTAINED**.

As a result of information collected during proffer agreement interviews of former P/O Jeffrey Walker, P/O Graham was implicated as being a party to criminal conduct.

During an interview conducted by the FBI, P/O Graham was questioned about allegations made by P/O Walker, specifically the "Brockton Road" job. During the interview, P/O Graham denied that he ever took money on the "Brockton Road" job, or any other job.

At a later date, a follow-up interview was conducted by the FBI. During the second interview P/O Graham agreed to give a statement and take a polygraph examination, which he failed.

After the results of the polygraph examination were revealed, P/O Graham admitted he lied.

P/O Graham then confessed that he received an envelope containing an unknown amount of money from P/O Walker, about one week after a job P/O Graham referred to as the "████████b", or "██████████." P/O Graham stated instead of keeping the money, he threw the envelope in a trash can of the Sunoco Station located at 28th St & Passyunk Ave.

A copy of this report will be forwarded to the Commanding Officer, Police Board of Inquiry, for necessary action.


Kevin Hall
Inspector
Investigative Support Services

| | |
|---|---|
| **STATEMENT OF:** | P/O Reginald Graham #6214, Payroll #220827 Appointed 03/06/95, Assigned 09/25/00 Narcotics Field Unit. Currently detailed to DPR. |
| **DATE AND TIME:** | 06/22/16 @ 10:00 pm |
| **PLACE:** | 7800 Dungan Rd. |
| **CONCERNING:** | IAD Control #14-1404 |
| **INTERVIEWED BY:** | Sgt. Chester O'Neill #8785, IAD |
| **IN THE PRESENCE OF:** | Tariq El-Shabazz, Esq. |
| **RECORDED BY:** | Sgt. Chester O'Neill #8785, IAD |

Officer, I am Sgt. Chester O'Neill #8785, Internal Affairs Division. I will be taking your statement directly onto the computer.

Q. Are you represented by counsel?
A. Yes

Q. Have you had the opportunity to consult with your attorney?
A. Yes

Q. Do you wish to be represented by counsel?
A. Yes

You are reminded that failure to cooperate in a Departmental Administrative Investigation is punishable by ten (10) days suspension to dismissal under Article 1-§008-10 of the Disciplinary Code.

You are also reminded that lying or attempting to deceive regarding a material fact during the course of any Departmental investigation is punishable by dismissal under Article 1-§009-10 of the Disciplinary Code.

Q. Do you understand this?
A. Yes

Q. Are you willing to cooperate?
A. Yes

RC #6214

Officer, I am questioning you concerning an investigation that was conducted by the FBI and United States Attorney's Office (USAO), for the Eastern District of Pennsylvania (EDPA). On 12/08/15, the USAO for the EDPA issued a declination of charges letter to the FBI concerning you. On 4/13/16, the Office of the District Attorney, Special Investigations Unit issued a declination of charges letter to the Philadelphia Police Department, Internal Affairs Division. This interview is an IAD administrative interview.

Q. Do you understand?
A. Yes

Q. During the federal investigation of former P/O Jeffrey Walker and other members of the Narcotics Field Unit, you voluntarily came forward to the FBI with information, correct?
A. That's correct.

Q. Did you speak to anyone regarding concerns you had before you spoke to agents from the FBI?
A. Yes

Q. Who?
A. Sometime in 2003 or 2004 I was summoned to Internal Affairs to give a statement on one of the cases that Liciardello, Walker, and Reynolds had generated a complaint. I told the investigator at that time that I was tired of coming down here because they were getting complaints and they were being sued. I told the investigator that I was used only in a back up capacity and was not involved in getting the probable cause that the arrest were being based on. I was contacted immediately after leaving IAD from my Sergeant at the time. His name is Chester Malkowski. He since has retired. Sgt. Malkowski questioned why I was at IAD and he wanted to know what I was telling IAD. He said, Why was I saying things about the squad. He was basically letting me know what I had said down at IAD.

I know that Sgt. Malkowski told P/O Reynolds and P/O Liciardello what I had said at IAD because the next time we met they gave my partner and I the cold shoulder. It was also about that time that P/O Liciardello called me a, "Snitch".

I also told Cpl. Larry McKinney. I knew him prior to him coming to the squad. I alerted and warned McKinney about what was going on with Liciardello, Reynolds, and Walker. I told him that some of their jobs were shady and that they had a relationship with Sgt. Malkowski. We went on several of their jobs and things did not seem right. I told the Cpl. When we go on the street he could ride with us, I also told him and warned him to stay away from the 3 officers.

About three months after Cpl. McKinney had come to the squad and I had warned him about the 3 officers, he went out drinking with them one night. The Cpl. struck up a conversation with the officers and he asked them how come it takes other people in the squad longer to bring in jobs. From that conversation the Cpl. told the officers what I had told him when he first came to the squad. The next day when I returned to work myself and my partners had an argument with Liciardello and Reynolds about what I said about them. Myself and my partners, P/O Mike Williams and Barry Ciahar were basically threatened. We were told that they would have our jobs and we were told that they knew a lot of people.

Gregory and Raymond Randle filed a lawsuit with the city and I was brought down to the City Solicitor's Office, (Jean Durbin). The person I spoke to was a female. I told her that I could stand up my part in the case but I could not vouch for any other part of the case. I told her I did not want to be a part of their cases and I did not want to be associated with them because of the number of lawsuits they were involved in.

On my way back to City Hall to punch out I was called on my cell phone by Sgt. Malkowski. He spoke to me and it was clear to me that he had already been notified of my meeting at the City Solicitors Office and the content of what I had said at the meeting.

After the first case of the Randle's lawsuit we continued to be sued and I believe another 14 lawsuits were filed. At this point I had no one else to notify because the Capt. at that time was Capt. Malkowski and he was the cousin of Sgt. Malkowski.

So I went down to the commissioner's office one day to discuss a ticket my partner got from a Highway Officer. At that time I spoke to Sgt. Kim Byrd about the situation. I spoke to Kim Byrd and I told her all of my concerns about how Liciardello ran his own jobs and the rest of us were kept in the dark. I told her about the infamous black that was referred to in all of their probable cause. Their probable cause was always the same. Every case ended the same way with myself and other officers inside of house, holding it, while Liciardello went and got a search warrant signed.

I also expressed to Kim Byrd that I wanted to get out of the squad, but shortly after I spoke to her Liciardello and Reynolds were removed from the street. They worked in the Operations Room and they made just as much overtime as they did while they worked the street.

I'm not sure of the date but the next incident I remember was being called to Federal Court for the Randle Case. I was named as a defendant. I was asked to be the first witness on the stand. I testified to what I knew and I took the opportunity to separate myself from the others. I told the judge that I didn't understand why I was named in the lawsuits and I gave him my reasons. The judge not only dismissed me from the Randle Case but the other cases against me were dropped. Mike Pileggi was the attorney that was representing the Randle's.

*RG #6214*

IAD #14-1404, P/O Reginald Graham #6214                                    Page 3

At that time the judge allowed me to leave the stand and I didn't have to participate in the trial at all. As I was leaving the courtroom the other officers involved in the lawsuit looked at me as if the wanted to kill me, and if they had the chance they would kill me. After I returned to work things changed at the unit. Cases that I was working were put on the back burner. These cases were my primary cases and something was always more important than my cases. I had several good jobs and I was not recognized for my good work while Liciardello, Reynolds, and Walker were constantly recognized and put in for awards. We did not work together from that point. It was more of an us vs. them mentality.

Another development after the Randle Case was that the Sgt. Malkowski made P/O Walker ride and work with us. That was never done before. I felt it was a way for Sgt. Malkowski to keep an eye on us. I think that Walker was there to fish for info and report back to Malkowski, Liciardello and Reynolds.

# Sgt. Malkowski agreed. Sometime after the Randle Case and during the time that Liciardello and Reynolds were off the street I worked with P/O Walker. At that time we had a conversation about the Randle Case and he told me to watch myself. He told me that Liciardello and Reynolds were very upset with me about the Randle Case and all of the other things that had transpired. P/O Walker even warned me ~~about who I should talk to.~~ to be careful who I'm talking to.

After I had the conversation with P/O Walker, I did become more cautious. I started to change up my routine and I began to take different routes home after leaving work. I had two incidents occur after I spoke to P/O Walker. The first was someone punctured all four of my car tires. The second was all of the windows in my apartment were cracked as if someone threw rocks at the windows. I did not report these incidents because I did not know who to contact because I feared that no matter who I spoke to it would get back to Liciardello, Reynolds, and Walker.

I spoke to Curtis Douglas because he asked me about a case, ▓▓▓▓▓▓▓ that I was involved in. He asked me if Liciardello, Reynolds, and Walker could be used on the case. I told him no, I also told him all of my concerns that I mentioned to you about them. I told him that I wanted to disassociate myself from them. At the time I was working on a Federal Case, I liked it that because it got me away from Liciardello, Reynolds, and Walker. And by this time they had already been returned to street duty.

I was called by Sgt. Byrd when Liciardello and Reynolds were put back on the street. The conversation I felt was to warn me they were coming back and to be careful. She also gave me the sense that she was told they good guys. I felt that everything I told here about them that nothing was going to be done.

After they returned to the street it seemed as though Sgt. Malkowski was trying to get them involved in the Federal Case that I was working with the FBI and the DEA. I was able with the help of the DEA and the FBI to keep them out of the case. It seemed at that point that I was Sgt. Malkowski best guy because I was working a good case with Federal Agencies

R.G. #6214

Q. Where was Sgt. Kimberly Byrd assigned when you spoke to her?
A.  She was assigned at the Commissioner's Office in the PAB.

Q. In what capacity?
A. She was the Commissioner's Aide.

Q. DDA Curtis Douglas referred you to the FBI, correct?
A. Yes

Q. Did you ever report your concerns to your supervisors or commanding officer?
A. I had a conversation with Lt. Wixted and Sgt. Meehan, when they broke up the squad
and separated us. I told them that it might be a problem if P/O Walker transferred to our
squad. I did not give them all of the info I knew about P/O Walker because I did not
know who to trust. However I did voice my concerns about P/O Walker, but a few years
later he ended up in our squad.

Q. Jeffrey Walker made allegations that you stole money along with him. He specifically
talked about the "Brockton Road" job and a "shoebox" job. You were questioned about
those allegations by FBI agents. You initially denied ever taking money on a job or
taking money from Jeffrey Walker. You then voluntarily agreed to take a polygraph
examination administered by the FBI regarding those allegations. After the polygraph
indicated you were deceptive, you then told the FBI about receiving money from Walker.
Is that correct?
A. Yes. The Brockton Road job was my case and the FBI was adopting the case because
we were taking down a whole organization. P/O Walker was assigned to work this case
by Sgt. Malkowski. I did not need him on the case because there were plenty of others
from other agencies. P/O Walker, I felt was put there to keep an eye on what I was doing.
At the time of this job Liciardello and Reynolds were off the street. However, Sgt.
Malkowski gave them evidence that I recovered from a trash pull and had them take it to
the lab in attempt to get fingerprints from what I recovered. I felt he did this to try to get
them in on the case.

The "shoebox" case I don't have any idea about that. I was never asked anything about a
shoe box case when I was polygraph.

A vehicle was confiscated during the Brockton Road Job. I had the car transported back
to HQ. While the car was being transported I was back at HQ doing the paperwork,
search warrant. When the car arrived at HQ the car was searched by P/O Walker, P/O Jett
and P/O Mike Williams. P/O Jett had just been detailed in to the unit and he called me on
the phone and told me that P/O Walker had offered him money that was recovered from
the car. P/O Jett told me he refused P/O Walker's offer. I then asked P/O Jett to put P/O
Walker on the phone and I told him off. P/O Walker responded, "I was just playing with
him". I then told P/O Walker he better bring the money upstairs right now.
I told P/O Walker I didn't care what he did on his jobs but this was a Federal job and I
was assigned to the job.

R.G. #6214

IAD #14-1404, P/O Reginald Graham #6214                                        Page 5

P/O Walker then brought the money inside. P/O Walker took the money to Sgt. Malkowski's office. I could not see inside Malkowski's Office. As soon as the money was brought into the office Liciardello and Reynolds went into the office. I did not count the money because I was not allowed in the office. I knocked on the door but no one answered so I just went back to processing my stuff. However, as a precaution I changed who the recovering officer of the money was on my PAR's Report. I made the recovering officer, Sgt. Malkowski because he counted the money and accepted it from P/O Walker. Sgt. Malkowski gave me a total of $32,000.00. I felt that I was being set up because Sgt. Malkowski told me $32,000.00 was recovered but he put $34,000.00 on the search warrant. I was also suspect because I did not get a break down by denomination of the money that was recovered. I also asked an FBI agent to come and get the money because I was not comfortable with the money staying there. When the FBI counted the money they found that $32,252.00 was recovered. This was different from what I was told by Sgt. Malkowski and it was different from what was on the search warrant.

Q. Tell me the circumstances surrounding you receiving money from Jeffrey Walker.
A. The circumstances surrounding when P/O Walker gave me an envelope had nothing to do with the Brockton Road Job. That was the focus of FBI because they were going off what P/O Walker had told them. The time P/O Walker gave me the envelope at 28th & Passyunk Ave. I was in the Sunoco Station when P/O Walker approached with the envelope. I believed at the time that I was being set up because while I was talking with P/O Walker, I saw a silver Chevrolet Impala with tinted windows park in front of the bar across the street from the gas station. I took the envelope but I never opened it. I thought about the conversation I had with P/O Walker and I felt at the time no one was going to believe me if I turned this in because of everything that happened before this. I took the envelope and I threw it in the trash can at the Sunoco Station.

I felt very nervous when I took the polygraph. I did a preliminary interview with Sgt. Deacon before taking the polygraph. This upset and alarmed me because when he introduced himself, he said he worked at Narcotics for several years and he knew and worked with Sgt. Malkowski and Lt. Wirted. Sgt. Deacon also said he worked with several other supervisors that still work there. It also bothered me because I felt that it was now going to get out that I was down at the FBI giving info and people back at the unit would know that I was there.

I was worried about information being leaked because in the past I was asked by the FBI to wear a wire against P/O Williams and P/O Clahar. A little while later I was told by a former partner that I was asked to do that. I knew there was a leak because that was true. *All info. talked about with Feds, the fact that I took a polygraph, I wore a wire, etc.*
Q. Why weren't you truthful to the FBI agents when you were initially asked about taking and/or receiving money from Jeffrey Walker?
A. The FBI focused in on Brockton Road and I vehemently denied ever taking anything on that investigation.

*R G #6214*

---

IAD #14-1404, P/O Reginald Graham #6214                                    Page 6

Q. Did you ever take, or receive money from Jeffrey Walker, money that was recovered from the trunk of a car related to the Brockton Road job?
A. No

Q. Is there anything else you can add to this statement that has not been addressed in this interview?
A. No

STATEMENT CONCLUDED: 6-22-16 @ 1:05PM

I HAVE READ THE FOREGOING STATEMENT CONSISTING OF (7) PAGES AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

NAME: Reginald Graham

DATE & TIME: 6/22/16   1:30 PM

UNIT: 1

IAD #14-1404, P/O Reginald Graham #6214                                      Page 7

**STATEMENT OF:**   Jeffrey Walker B/M
DOB: 10/06/68

**DATE AND TIME:**   06/29/15 @ 9:40

**PLACE:** William J. Green Federal Building
600 Arch St., 4th Floor

**CONCERNING:** IAD Control #14-1401

**INTERVIEWED BY:** Sgt. Gerard J. Deacon #835, IAD

**IN THE PRESENCE OF:** Sgt. Chester O'Neill #8785, IAD

**RECORDED BY:** Sgt. Gerard J. Deacon, #835, IAD

I am Sgt. Gerard J. Deacon #835 of the Internal Affairs Division. I will be taking your
statement directly onto the computer.

I am questioning you concerning the information you provided to the FBI during a series
of proffer interviews between you, the FBI and the United States Attorney's Office for
the Eastern District of Pennsylvania. I reviewed those interviews and the following
questions were gleaned from them.

Q. Tell me about your participation with P/O Reginald Graham in stealing money.
A. We were involved in a search warrant of a vehicle from a property on Brockton Road.
The man associated with the vehicle and property was arrested and the property was also
searched. A large amount of money was found in the trunk of the vehicle and it was taken
into Sgt. Chet Malkowski's office. I found another bag of money in the trunk of the car. I
took that money and split it with Reggie. I split the money with Reggie at the back of the
car. We then went up to the office and took the rest of the money up there. That is when
Reggie gave the money to Sgt. Malkowski. Liciardello and Reynolds then went into
Malkowski's office and closed the door. I also gave some money to Lou Cujdik, Sr.

Q. Did you give any money to P/O Graham at the Sunoco gas station later that night?
A. No I did not.

Q. How much money did you give P/O Graham?
A. I don't remember.

Q. How much money did you give P/O Cujdik?
A. I don't remember.

Q. Do you have any other information regarding P/O Graham and illegal activities that
you witnessed?

---

A. There was another time when I took money and split it with P/O Graham. It was a small amount of money. I don't remember where or when.

Q. Tell me about the Jamaican guy in the 35th District?
A. It was an Internal Affairs job. The job was either Liciardello's or Spicer's. Sgt. McCloskey was there. By the time me and P/O Norman got there, the guy was "getting his balls beat off." The guy apparently resisted them. A search warrant was typed up after the fact.

Q. When did this occur?
A. I don't remember. Lt. Otto was there.

Q. Where did it occur?
A. Can't remember the street. It was a big apartment building.

Q. Were you interviewed by Internal Affairs regarding this?
A. Don't remember but I think I did.

Q. Who was the Internal Affairs investigator?
A. I think it was Sgt. Chilutti.

Q. You spoke about Liciardello divulging the name of an informant. Tell me about that.
A. Liciardello divulged the identity of an informant to a guy he locked up. Shortly after the guy got out of jail, the informant was killed. Liciardello bragged to me that the informant was killed. Reynolds knew about it too.

Q. Where was the job at where was the guy was locked up?
A. It started in North Philadelphia but ended up around 50th Street and Haverford Avenue. It happened right before the Kushner job. A light skinned cocky black kid from 4200 Leidy Street was killed. Liciardello locked up a guy with a thick Muslim beard around 50th and Westminster Streets. Liciardello told the guy the kid from 42nd Street gave him up. After that the kid was killed. Liciardello admitted he got the kid killed. He said that he did it before where someone was killed.

Q. Do you know about any other ones?
A. One in Roxbourgh. It involved ███████ We were in a guy's house in Roxbourgh when Liciardello did it. I don't know if anything ever happened to the guy.

Q. You spoke about a job involving a Jamaican male who had a lot of money in a bowling ball bag. Tell me about that.
A. It was a red pickup truck that we stopped up the northeast near the expressway. The job also involved a search of a house off of Roosevelt Blvd. It happened during the first time our squad worked out of G and Hunting Park. There was a female involved who was arrested for having a gun. Betts, Spicer, Norman and Liciardello were in the squad. Carl Stubbs may have been involved doing the surveillance on the house. The job was given to one of the guys by P/O Tim Wade. I think he was a NETS P/O in the 15th at the time.

When we stopped the red pickup truck we found a bowling bag full of money. Liciardello told me to hand him $20,000 out of the bag so he could pay his bookie. I gave him the money and kept $5,000 to $8,000 for myself. Liciardello told me later that he gave Betts and Spicer money from the bag too. I gave him the money back at G Street. Spicer and Betts got some money too but I don't know how much. Liciardello gave them the money back at G Street. I think the truck was confiscated and taken to the pound.

Q. Did you witness that?
A. Yes I was there.

Q. Do you know where the house that was searched was located?
A. In the northeast. Maybe close to the 8th Dist. We stopped the guy right on Roosevelt Blvd. right before Woodhaven Rd.

Q. You spoke about a job that occurred in 2012 when you were in Sgt. Meehan's squad. You claimed that Norman took money on the job. Tell me about that.
A. It was P/O Cleaver's job. It was on the "white side" of south Philadelphia. Norman found money on a dresser and gave me $300.00 to $400.00. That was the Galsaka job where he took the money first.

Q. You spoke about a job that you described as a Dominican row house in Northeast Philadelphia where you and Norman found heroin. Tell me about that job.
A. It was around 2009 or 2010. We found and took three or four bundles of heroin. Norman took the bundles and gave them to his people. He later gave me $500 - $1000.

Q. Where was the house in Northeast Philadelphia?
A. It was lower northeast Philadelphia. The job was on the news because of the amount of heroin.

Q. Who was the assigned?
A. I believe it was Liciardello, but I am not sure. All of the heroin was in the basement in a hidden compartment in the basement. It had a granite top.

Q. You spoke about a job that involved a car stop of a female where Liciardello took her keys, went back to apartment and searched it without a warrant. Tell me about that.
A. Reynolds and others went back to the apartment too. I was out of the loop then and I stayed and watched the female in the car.

Q. When did this occur?
A. Around 2001. The job was in Wynnfield. It was a guy's apartment building. Originally it was me and Reynolds in the car with the girl. Eventually, me and Reynolds went up into the apartment with the others.

Q. Who were the others?
A. Sgt. McCloskey, Liciardello, Spicer and Betts.

Q. Where was the apartment?
A. Wynnfield Ave.

Q. Where was the car stop made?
A. I am not sure. Might have been on Brynmawr Ave.

Q. Was anything found during the car stop?
A. No.

Q. Was Sgt. McCloskey there at the car stop?
A. Yes. Two W/M officers were also there from the district. The job had to do with pills.

Q. You spoke about a job that occurred in South Philadelphia where a guy came in from California and a large amount of marijuana was found. Tell me about that job.
A. It was a white guy who came in a cab. The team waited for him to get out of the cab and go into the house. We then bum rushed the house. There was a large amount of marijuana in duffle bags in the house. At one point I went upstairs and Reynolds hollered at me to go back downstairs but I saw him taking money from a dresser. Lt. Otto was there. After we were done the search, I was in the car with Liciardello and Reynolds. I was then told by someone to go get beer so I got out of the car. They gave me money for beer. When I left in my car to get beer, I saw Reynolds and Liciardello moving around in their car and I felt they were splitting money that they stole amongst themselves.

Q. Did you see where Reynolds put the money?
A. In his jean pocket.

Q. Are you positive that Reynolds kept money from that job or is it just a belief that he did?
A. He took the money and nothing was ever recorded that he took money from that location.

Q. Who else was there at the job?
A. Lt. Otto, Spicer, Betts, Liciardello.

Q. Was Sgt. McCloskey there?
A. I don't remember.

Q. Was Lt. Otto there when you brought back beer to headquarters?
A. Yes.

Q. Was he aware you had beer?
A. Yes we would put it in the refrigerator. We always had beer in the refrigerator and drank it while we did paperwork.

Q. We always had beer. Sgt. Meehan knew about it too. He and/or Otto would tell us to make sure we kept the beer in cups.

Q. Did the supervisors drink on duty too?
A. Yes they did. Sgt. Malkowski did. Lt. Otto a little here and there. I don't know if Sgt. Meehan, Sgt. McCloskey or Sgt. Gorman did while on duty. Lt. Otto had his own stash in his office.

Q. You spoke about the time you took drugs and a gun at a hotel job and that Norman had knowledge of it. Did Norman take anything on that job?
A. No. We were still working. He told me to hold onto the drugs until he talked to his people. I would only hold the drugs for a day and get rid of them. Norman asked me later what happened to the drugs and I told him I got rid of them. I kept the gun.

Q. When did that happen?
A. Around the time we did ████████'s job we talked about.

Q. Where did it happen?
A. Roosevelt Inn.

Q. Was there a supervisor present on that job?
A. No.

Q. Is that the gun the FBI recovered from your basement?
A. Yes.

Q. You told the FBI that Liciardello ran a book. Explain that.
A. He told me he was taking bets and numbers and he had a book going. He had a number of phones.

Q. Did you ever bet with him?
A. No.

Q. Did you witness other officer's place bets with Liciardello?
A. No.

Q. You spoke about a speakeasy operated by Norman. Tell me about that.
A. The name of the club was "The Hole." It is off of 26th and Ridge in North Philadelphia. It is adjacent to a community center off of Cecil B Moore Avenue. Norman was selling liquor out of there without a license. Norman was talking to Cpl. Jacqueline Stanford from CWV, and asked her to give him a heads up if there are any PA State Police investigations on the place.

Norman was there every Friday and Saturday night and he made approximately $3,000 a night. If the police were called there, Norman would climb a set of stairs in the back of the building that led to a loft in another building.

Q. Describe the building where the speakeasy is.
A. Maroon colored non-descript with a black iron gate at the pathway in the front.

Q. Did the pathway lead to the building?
A. Yes. That is how it got the name "The Hole."

Q. How many times were you there?
A. Once while open and three times when it was closed and they were cleaning up.

Q. Tell me about the security monitor box that Norman took during a search warrant.
A. It was my job on Wallace Street. The guy had a bunch of security camera all throughout the house. Lt. Wixted, P/O Brown, P/O Galaska were there. Sgt. Meehan was there. I saw it back at Sgt. Meehan's office later. Norman took it out of Sgt. Meehan's office and took it to his club. It was a big monitor box. Everyone knew that Norman took it out of the house.

Q. Did everyone know Norman took it out of Sgt. Meehan's office?
A. No just me and Sgt. Meehan.

Q. Did Sgt. Meehan know Norman took the box to his club and/or home?
A. No he didn't know what Norman was going to do with it. Only I knew.

Q. Who was the subject of the search warrant?
A. Eric Pratt.

Q. Is that the job documented under DC# 12-16-049902?
A. Yes

Q. What location was the box taken from?
A. The rear bedroom. He had a whole hookup in the rear bedroom.

Q. Did anyone else see him take the security box?
A. From the house, everyone did.

Q. Did you ever see the security box at the club?
A. No, but I know he had a monitor system in there. I saw that.

Q. Do you have any firsthand knowledge of Norman robbing people accompanied by someone other than a police officer?
A. He told me he tried to rob a drug dealer but the guy got away. He did it with a family member. They both acted like they were cops.

Q. You spoke about witnessing P/O Jeffrey Galazka steal money. Tell me about that.
A. On a search warrant I saw Galazka take money from a drawer and stuff some of it down his pants and then attempt to run out of the room with the rest. Norman yelled to

shut the door to stop Galazka from leaving. Norman and Galazka went down stairs and Norman came back up and gave me some money. I asked what was up with that. Norman told me they didn't trust me and they wanted to go through him. Norman took a money order on that job but it got destroyed, I think in Norman's washer.

Q. Where was the warrant served at?
A. That was the on the white side of south Philadelphia, near the projects off of 76.

Q. Who was the assigned?
A. P/O Cleaver

Q. Was there a supervisor present?
A. Sgt. Meehan. Sgt. Meehan sprayed a dog with pepper spray. It was a little pit bull.

Q. You spoke about a job where P/O Michael Brown was the assigned. You said that Norman stole between $200 and $400 that he found in a pants pocket that were on the floor. You received half of the money. Where was the location this warrant at?
A. It may have been on Sloan or Union Street.

Q. When did it happen?
A. Towards the end before I was arrested.

Q. Did anyone else know about the money?
A. No.

Q. Who was the supervisor present?
A. Lt. Wixted, Sgt. Meehan.

Q. You spoke of seeing Speiser stealing buy money from a job in the 35th District where the suspect was a janitor in the 5th District. Tell me about that.
A. Liciardello had to replace the money from money they had taken from the house and photocopy that money as if it were the buy money. I saw him do it. The buy money was lost on the job.

Speiser took money from a closet in the guy's house on that job. The sergeant was standing right there but I don't know if the sergeant saw him take it. Speiser was mad at me back at the Post Office.

Q. How do you know Speiser stole the money?
A. I saw him. He put it in his pocket.

Q. Did other officers know Speiser took the money?
A. Yes because I told Liciardello he did it.

Q. Where was that warrant served at?
A. Near Germantown Avenue where the neighborhood starts to turn nice.

Q. Did a supervisor know that buy money disappeared?
A. I don't know.

Q. You spoke about an incident where you and Norman took 2 pounds of marijuana off a male who worked out of the barbershop at 54th & Woodland. Tell me about that.
A. The guy had a Suzuki jeep. I found the drugs and gave them to Norman. Me and Norman took the drugs to north Philly. He walked around the corner and came back and gave me some money. It was the same day they did the job near Delaware Avenue. Me and Norman were with them in south Philadelphia and then we left and then me and Norman left and did the weed job. Their job led to the apartment were they got a lot of money.

Q. Who are they?
A. Liciardello, Spicer, Betts.

Q. Did you do any paperwork on the weed job?
A. No, I don't think we did.

Q. What was the guy's name?
A. I don't know.

Q. Who was your supervisor at the time?
A. Sgt. McCloskey.

Q. Did he know that you guys were going to Southwest to do a weed job?
A. No, he knew we were floating.

Q. Did anyone talk to you about that job?
A. I received a call from P/O Greg Barber. Barber told me that he heard we had taken some marijuana from someone earlier that day. I denied it.

Q. Where did Greg Barber work?
A. NFU.

Q. Do you know how he found out about the incident?
A. No.

Q. You spoke about Liciardello being called into Captain Werner's office and shortly thereafter, you, P/O Palmer and Liciardello went to an apartment in Roxborough. Tell me about that.
A. It was an elderly relative of either Werner's or Blackburn's who had neighbors who were drug dealers. We went to the apartment and knocked on the door. Three white guys were inside. We grabbed the guys and roughed them up. Liciardello searched the apartment and their sports cars.

Q. Where was the apartment located?
A. It was an apartment complex on Henry Avenue.

Q. Was it just the three of you who went to the apartment?
A. Yes.

Q. Did you have a search warrant?
A. No.

Q. Was anyone arrested?
A. No.

Q. Were any supervisors with you?
A. No, but they knew because they gave us the mission.

Q. What supervisors knew?
A. Werner, Otto and I am not sure of who else.

Q. When did this happen?
A. I think Otto was a sergeant at the time.

Q. You spoke about the arrest of ████████ and Liciardello's actions while you were waiting for a search warrant. The job was documented under DC# 10-05-000294. Tell me about that.
A. We were waiting to serve the search warrant and waiting for him to come out of his house. Liciardello got impatient and threw a brick through ████'s car window. McCloskey was there and didn't do anything. He wanted to make sure that it wasn't in any paperwork what Liciardello did. After the brick was thrown through the window, ██████ came out with a gun in his hand. McCloskey told me to put on the paperwork that the gun was in his waistband. ██████ ran back into his house and we chased him in. We then beat him until he told us where he put the gun. The guy had 2 Pitt bulls in cages.

Q. Who were all the other officers on the scene?
A. Norman, Spicer, Betts, Liciardello and other officers came to help with the search warrant.

Q. Who beat J██████?
A. Spicer and Liciardello. It was in his basement.

Q. Who were the other officers who came?
A. I don't remember.

Q. You spoke about Liciardello stealing money from a motorcycle shop and then changing his mind and put it on a property receipt. Tell me about that.
A. I was familiar with the shop because I had taken my bike there to be worked on. Liciardello found some money in a car and took it. He shared some with me and

Reynolds. When we got back to headquarters, there were 15 to 20 Puerto Ricans there trying to get the money back. Liciardello made me and Reynolds give the money back and it was put on a property receipt. The job was originally Liciardello's but he passed it on to me. I then told the guys involved that the money was evidence and was already put into the system. I think that the female officer who was killed was associated with the same family.

Q. Officer Isabel Nazario?
A. Yes

Q. Where was the shop located?
A. We did not go to the shop. We stopped the guy when he was driving a car down a street in the 25th District.

Q. How was it associated with the motorcycle shop?
A. The kid was connected to the shop but we did not go to the shop. The job was not connected to the shop.

Q. Was there a supervisor there when the car was stopped?
A. No.

Q. Who was the supervisor then?
A. I am not sure.

Q. Who was the defendant?
A. I don't remember. Some Puerto Rican kid.

Q. You spoke about a job that was documented under DC# 06-06-005856, where you took money and split it with Liciardello. Tell me about that.
A. I was called to go to the 9th District and meet a prisoner. The prisoner was giving up his supplier. Liciardello had the prisoner call his supplier and told him to meet him on Spring Garden Street. When the supplier showed up, Liciardello told the prisoner to call him and cancel the meet. Liciardello did this so he could identify the supplier and see where he lived.

I stayed with the prisoner in the 9th while Liciardello and others went to the supplier's apartment. They locked up the supplier when he came out of his apartment and Liciardello took his keys. Liciardello called me and told me to meet him. He gave me the keys, told me to go to the guy's apartment and look around. I didn't have a warrant or consent but I went to the apartment and found drugs and money in the freezer. I left the drugs in the freezer but took the about $6,000 to $7,000 from the freezer. Lt. Jackson and other officers arrived at the scene. That's when I gave the keys back to Liciardello. I later split the money with Liciardello and he complained that I should have taken more money.

Liciardello was in that apartment before with Lt. Jackson and they already knew what was in there. Liciardello told me where it was and he told me about the money and drugs.

Q. How do you know Lt. Jackson was there?
A. Liciardello told me that after the arrested the guy he, Jackson and other officers went in there and looked around.

Q. Was Jackson a lieutenant at the time?
A. Yes.

Q. When did it happen?
A. Maybe 2006.

Q. You spoke about persons by the names of ▓▓▓▓▓▓ and ▓▓▓▓▓▓. Tell me about them.
A. I think ▓▓▓ was from Bartram Village and he was associated with ▓▓▓▓. I was always after ▓▓▓▓ and Reggie Graham told me that ▓▓▓▓ wanted to kill me. ▓▓▓▓ was in the FDC also and I talked to him. Hamm told me that ▓▓▓▓ told me that Liciardello and Reynolds stole $300,000 from him.

I remember the job and it was in a condo on Conshohocken Ave. Graham was also involved in the job. I didn't know about money being taken. The group was Sgt. Malkowski, Liciardello and Reynolds.

Q. You spoke about a job where Betts beat up a Dominican male. Tell me about that.
A. It was either Liciardello's or Spicer's job. It was a heroin job near a park, in I think the 15th District. Betts beat the Dominican guy badly. The whole squad was there, including Norman and Lt. Otto.

Q. Why did Betts beat the guy?
A. It was Betts, Liciardello and Spicer who beat the guy. I don't think Norman did. I don't know why they beat him. They chased the guy in there. Uniform police came because the guy was screaming and someone called 911. The guy was arrested.

Q. Did you see the guy getting beaten?
A. No, I saw the results of the beating. I was told later who beat him.

Q. Was Sgt. McCloskey there?
A. Yes.

Q. When did it happen?
A. I don't remember.

Q. You spoke about a male identified as ▓▓▓▓▓▓ who you saw at the FDC. Tell me about that.
A. I saw him in custody at the FDC and he threw urine at me as I walked past his cell. ▓▓▓▓ was angry because he said $100,000 was taken from him when we locked him up. I remembered the job. It was in a garage in East Division around 2010. There was a pool

table in the garage with a lot of money inside it. I did not take any money and I don't know if any money was taken on that job. Sgt. McCloskey, Spicer, Betts and Norman were also there. The guy was hiding in a whole down a ladder. They were throwing crap at him to have him come out. Liciardello was using the guy as a source after that.

Q. You spoke about Liciardello beating a male with a 2x4. Tell me about that.
A. I think it was a white male who ended up cooperating with Liciardello. I don't know where it happened at.

Q. You were shown a photo of a male identified as ▆▆▆▆▆ You said he looked familiar but you were not sure if he was the male beaten. Is that accurate?
A. Yes.

Q. You spoke about a job involving ▆▆▆▆▆▆▆▆, a male who was involved in a pharmacy burglary. It was investigated by IAD. Tell me about that.
A. I chased the guy onto the roof. Up on the roof he had nowhere to go. I fought with him and beat him up. I saw the squad going into the guy's apartment on the first floor. Spicer told me that I needed to say that I saw the guy trying to go into that apartment, that way they had the authority to go into the apartment. For that to happen, the guy had to turn right on the first floor and turn right again to get to his apartment. That didn't happen. I went along with Spicer and falsely testified to it in court. Sgt. McCloskey and Lt. Otto were there and both knew I lied about the guy trying to get into his apartment. We lied to IAD about the job.

Q. You spoke about an accident that Spicer was involved in. Tell me about that.
A. The accident occurred in Montgomery County just across the line from Philadelphia. It was in the parking lot of the Chili's restaurant near Conshohocken Avenue. They moved it from the parking lot and into the city and staged it near a tree. I think it was Ford Road. We pushed the car into a tree then called the 19th to do the report. Sgt. McCloskey was there when it happened and orchestrated how he wanted it moved to the city side.

Q. What did he hit in the parking lot?
A. Into a cement pole in the restaurant parking lot.

Q. Did you witness this?
A. Yes.

Q. Who else was there?
A. Betts, McCloskey, Liciardello, myself.

Q. You spoke about an incident where Liciardello gave a prisoner heroin while he was in custody in the 5th District. Tell me about that.
A. We were putting a guy in the 5th for overnight and he was getting sick. We took the heroin from a dealer in the vicinity of Indiana and Mutter Street, near 5th Street. We gave him the heroin before we put him in there. He snorted it in the car with us as we were

taking him to the 5th District. We picked him up the next morning and took him out to work with us.

Q. Who specifically gave the male the heroin?
A. I got the heroin and handed the guy the heroin. It was Liciardello's idea to find a guy with heroin. I jumped out on the guy and took his heroin. We did not like up the guy.

Q. Do you know the males name who went to the 5th District?
A. No.

Q. Was there a supervisor present when the male got the heroin?
A. No.

Q. You spoke about Liciardello turning a blind eye if people gave him information. Tell me about that.
A. He would tell drug dealers that if they gave him jobs, he would ignore what they were doing. I know he told ███████████ that.

Q. Who was ███████████?
A. He was a source that Liciardello got through another informant.

Q. Do you know the identities of other drug dealers that Liciardello gave a pass to?
A. A big guy at 42nd and Stiles. The guy was huge. Another guy in the 35th were a guy had a bar.

Q. You spoke about a job that occurred in 2007 or 2008, in the 24th or 25th District where two houses and cocaine was involved. Tell me about that.
A. The dealers were Puerto Rican and cocaine was involved. The houses were on the same street and I think it was Liciardello's job. Norman found a brick of money in the stove, and he showed it to me. I went and got Liciardello and he took the money down the basement. At some point later, the three of us were in our car. Liciardello then split the money three ways and split it with me and Norman. Later on Norman complained that the money Liciardello split up was half the size of what he found. I think I got more than $1,000. It happened at the end of 2007 or beginning of 2008. The one house had a kilo in it. I think Norman found that.

Q. Whose car were you in?
A. The work car. A dark colored Ford Explorer.

Q. Who else was there?
A. The whole squad was working the job but I don't know if anyone else got money.

Q. Who was the supervisor there?
A. I don't remember.

Q. You spoke about a job that occurred in approximately 2006 on Snyder Avenue, where you, Reynolds and Liciardello split money that was found. Tell me about that.
A. We searched the house prior to getting a search warrant. It was just the three of us. Reynolds found money on top of the kitchen cabinets. I don't remember how much it was but we split the money three ways. We then got a search warrant and the rest of the squad joined up to search the house.

Q. Whose house was it?
A. It was a white guy involved in some type of a custody dispute. Reynolds or Liciardello knew either the husband or wife and had information about the guy's drug dealing. The house appeared to be under renovation.

Q. Do you remember the street?
A. No, it was close to Snyder Avenue.

Q. You spoke about a job that you and Norman did in the area of 41st & Ogden Streets. Tell me about that.
A. We locked up a guy at 34th and Girard Avenue. Me and Norman went to his house and went in without a warrant. Norman took some of the drugs he found and took them to his people. Norman later gave me some of the money he got for the drugs. A search warrant was obtained after we took the drugs. Norman's people told Norman about the guy and I did the job.

Q. Who was the assigned?
A. Me.

Q. When did this occur?
A. Maybe before 2010.

Q. What was the male's name who was arrested?
A. No.

Q. You spoke about Norman losing drugs on a job and Lt. Otto knew about it. Tell me about that.
A. The job was on the 700 block of Union Street. Norman lost the drugs that were found. It was either powder cocaine or crack cocaine. Otto was notified that Norman lost the drugs. Otto then called the DA's office and told them the male was cooperating and we let him go. Otto did that to cover up that the drugs were lost.

Q. Who was the assigned on the job?
A. I was.

Q. Who else was aware that Norman lost the drugs?
A. The whole squad. A lot of people in the building knew about at.

Q. When did this occur?

A. Norman did a job earlier that day. If you find a job Norman did, it was that day.

Q. What was the male's name?
A. I don't remember.

Q. You spoke about a job you did at 5004 Pine Street were ▇▇▇▇▇▇▇▇ was arrested.
Tell me about that.
A. ▇▇▇▇▇▇ filed a lawsuit on the job. The allegations in the lawsuit were not true. The
investigation was a good job. But me and Norman did find money in the middle bedroom
and we took about $200 each. Norman found more money in the back bedroom and
wanted to take it but I said no because Lt. Otto was there.

Q. You spoke about a job where you put a gun on a male that you had first encountered at
the CJC. Tell me about that.
A. In was in either 2009 or 2010. Me, Liciardello and Reynolds were sitting on a wall
outside the CJC. An unknown black male had words with us. Later that day we were in
the area of B and Allegheny Avenue and we saw the same male. We chased him and he
ran into a house. I had a gun that I got from another job and put it in the male and arrested
him for it.

Q. What was the guy's name?
A. I don't remember.

Q. Where was the house he ran into?
A. Near B & Allegheny but I don't know the street.

Q. Did anyone else see you plant the gun on the male?
A. Liciardello and Reynolds.

Q. Did you or anyone else testify against this male?
A. I believe I did.

Q. What was the outcome?
A. I don't remember.

Q. When did this happen?
A. Maybe 2009 in the 25th District.

Q. You spoke about going to "washy washy's" locations in Chinatown. Tell me about
that.
A. They would go to the washy washy's in Chinatown. One time after they left,
Liciardello was going home and was driving at a high rate of speed. He got stopped by
the police. When he was let go, he continued at a high rate of speed, lost control and
crashed. As I understand it, Liciardello's wife was on the phone with him questioning
him about where he was at.

Q. How did you find out about it?
A. Liciardello told me.

Q. Did you ever witness them at the washy washy?
A. No, they always talked about it.

Q. Explain what a "washy washy" is.
A. It's illegal prostitution and gambling parlor.

Q. Who in your squad frequented the parlors?
A. Liciardello, Reynolds, Spicer and Betts.

Q. Did you and/or members of your squad exchange money for sex?
A. I didn't do it but they did because they told me they went there. Liciardello was a frequent flier.

Q. Did you specifically witness this or were you told about it.
A. No I was told about it.

Q. Did members of your squad do this while on duty?
A. I don't know.

Q. Where were some of the locations they went?
A. One near 11th and Vine with a white door. It is on 11th Street.

Q. You spoke about Liciardello urinating on a Quran. Tell me about that.
A. It was a job that happened off of 52nd Street near a park. I think it was Carl Stubbs' job. Other black officers were involved in the job. I can't remember who the defendant was. Liciardello knocked a Quran off of stand and proceeded to urinate on it. It was near that park at 52nd and Pine. It was a three story house.

Q. Who were the other officers there?
A. Stubbs, me. I don't know who the supervisor was.

Q. Did you witness Liciardello urinate on the Quran?
A. Yes.

Q. Did any other officers witness it?
A. I don't know.

Q. Who was the supervisor there?
A. Lt. Otto was there but he didn't see it.

Q. When did this happen?
A. Maybe late 2009 or early 2010.

Q. Where was the Quran located in the house?
A. As we were walking out the door. The guy had it on a nice stand.

Q. Did any other officers know what Liciardello did?
A. I can't speak for them.

Q. Did you ever tell anyone about what Liciardello did?
A. No.

Q. Is there any thing else you can add to this statement that has not been addressed in this interview?
A. No.


STATEMENT CONCLUDED:   12:35 PM

I HAVE READ THE FOREGOING STATEMENT CONSISTING OF (17) PAGES AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

NAME: _____

DATE & TIME: _____

FD-498 (Rev. 2011-10-05)

**FEDERAL BUREAU OF INVESTIGATION**
**POLYGRAPH EXAMINATION REPORT**

## EXAMINATION INFORMATION

| Examinee Name | Date of Birth | Social Security Number | Case File Number |
|---|---|---|---|
| Graham, Reginald | 1970-12-03 | 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 | 194D-PH-102913 |
| Examiner Name | Date of Examination | Date of Report | Examination Iteration |
| Scanzano, Thomas | 2014-05-14 | 2014-05-21 | Initial |

## EXAMINATION RESULTS

| Reviewer | Date of Review | Countermeasures Strongly Suspected or Confirmed: | ☐ Yes |
|---|---|---|---|
| DiVittis, Marc A | 2014-05-27 | Recommend No Further Testing: | ☐ Yes |

| SERIES NAME | SERIES RESULT | SERIES RESULT CODES |
|---|---|---|
| Acquaintance (ACQT) | | NDI (No Deception Indicated) |
| Criminal | DI | DI (Deception Indicated) |
| | | INC (Inconclusive) |
| | | NO (No Opinion) |
| | | SR (Significant Response) |
| | | NSR (No Significant Response) |

## CASE TITLE

JEFFREY WALKER;
REGINALD GRAHAM
PHILADELPHIA POLICE DEPARTMENT

## CASE / EXAMINATION SYNOPSIS

This agent was contacted by FBI SA Joseph Balestrieri in reference to a police corruption investigation. Balestrieri provided the following details of the investigation:

Balestrieri is conducting a police corruption investigation regarding accusations of criminal activity by members of the Philadelphia Police Department (PHPD), Narcotics Field Unit (NFU). During his investigation Balestrieri has developed PHPD NFU Officer Jeffrey Walker as a cooperating witness (CW). Walker has admitted his involvement in criminal activity as a member of NFU. Walker has provided information and details of his activity in stealing money and drugs from crime scenes. Walker has also provided the names of additional NFU members that were involved in the criminal activity.

Balestrieri has also been receiving additional information from PHPD NFU officer Reginald Graham. Graham has worked as a part time Task Force Officer (TFO) for the FBI, and was providing valuable information regarding the illegal activities of officers of NFU.

During proffer interviews of Walker, Walker provided information implicating Graham in the criminal activities of NFU. Specifically Walker stated that on January 21, 2005, NFU was involved in a narcotics search of the residence of 7408 Brockton Street, Philadelphia, PA. As part of the search a search warrant was executed on a car, Chevrolet Lumina, silver in color, that was located at the residence. Walker claimed that approximately $40,000 dollars was seized during the search of the car. Part of the money was split among the members of NFU, specifically Walker stated that he gave Graham $2000.00 from the search.


EXHIBIT
B

Baltestrieri interviewed Graham, who denied ever taking any money or being offered any money.

Baltestrieri requested that this examiner provide a polygraph examination to Graham to ascertain if he took money from the Brockton Street search.

On May 14, 2014, Graham voluntarily came to the office of the FBI, Philadelphia. Graham was interviewed by Baltestrieri and FBI SA John Hess. Graham agreed to take a polygraph examination to prove his innocence.

On May 14, 2014, Graham was advised of his "Miranda Rights". He stated that he understood them. He was shown a FD-395, "Advice of Rights" form and a FD-328, "Consent to Interview With Polygraph" form. Graham stated that he understood his rights and signed both forms.

During the pretest interview Graham stated that he has been a police officer for many years and has never stolen anything. He is a Deacon in his church and a good family man and father.

Graham is currently a police officer with NFU and is familiar with the following police officers from NFU who are under investigation:

Jeffrey Walker
Thomas Liciardello
Linwood Norman
Bryan Reynolds
Chet Malkowski

Graham knows that they are "dirty officers" and steal money from drug dealers and crime scenes. Graham stated that he avoids working with them, and is not friendly with any of them. He added that they are all "big hitters" in the PHPD and are protected by the administration.

In response to questioning Graham stated that he has never stolen anything as a police officer. In addition, no one has ever offered him money. Graham added that all the dirty officers know that he is clean, and would never offer him money.

Graham stated that he is familiar with the Brockton Street job because he was the affiant on the search warrant. Graham stated, "why would I steal anything from that job, it was my job." Graham recalled that money was secured from the car and was brought to PHPD Sgt. Malkowski. Malkowski, Reynolds and Liciardello went into a private room to count the money. Graham stated that this was very unusual because Graham was the affiant, and should have counted the money. After a short period of time Malkowski emerged from the room, and the money was in an evidence bag. Malkowski provided Graham with a post-it note, and stated, "this is how much money was in it." Graham stated that he felt like they had stolen a portion of the money.

During this same time Graham received a telephone call from PHPD NFU Alphonso Jett. Jett was guarding the car with Walker. Jett told Graham that Walker had offered him stolen money from the search. Jett refused to take the money. Graham stated that he called Walker and told him not to do those things on his jobs.

Page 2 of 4

In response to questioning Graham stated that Walker did not offer or give him any money on the Brockton Street case. Graham added that Walker never offered or gave Graham any money. Graham has never been offered, stolen or given any illegal stolen money from any police activity.

Graham stated that he believed that the address was Brockton Road, not street. Graham stated that he understood all of the questions and would have no problem passing the test

The following relevant questions were asked during the examination for Theft Series I:

A. Did you steal that money from Brockton Road? (Answer: No)
B. Did you take that money from Walker? (Answer: No)

During the post-test interview Graham stated that he had no idea why he failed the test. Graham adamantly stated that he never stole anything. Graham stated that Walker was lying because he wanted credit for his cooperation.

Graham stated that he has been overlooked for promotions and commendations because he has been honest on all of his jobs. Graham added that all the "dirty officers", referring to the corrupt officers, received all the accolades from their superiors.

In response to questioning Graham stated that sometime before the Brockton Road case, he was involved in a large drug/money seizure. The case involved suspect Terry Scruggs. The Scruggs case led to the case at Brockton Road. During the Scruggs case a shoebox full of money was recovered. Approximately one week after that case Graham received a telephone call from Walker. Walker asked Graham to meet him at a Sunoco Gas station. Graham stated that he drove to the gas station and began filling up his gas tank. When Walker arrived he handed Graham an envelope and then drove off. Graham stated that he threw the envelope in the trash can at the Sunoco station.

In response to questioning Graham stated that he did not open the envelope, and had no idea what was in the envelope. Graham has no idea why Walker would have given him an envelope.

In response to questioning Graham stated that there was money in the envelope, and Graham assumed it was stolen money from the Scruggs job. Graham stated that he did not keep the money and threw it in the trash.

In response to questioning Graham stated that he lied to this agent because he was afraid of the repercussions. He felt like no one believed him, and would assume that he was as dirty as the other officers. Graham stated that he has never received the respect that other narcotics officers got. He never received any commendations and others received credit for his work. Graham added that Walker, Liciardello and Reynolds are protected by the "higher ups" in the administrations, and they would not protect him.

The results of this examination are located in the "Examination Results" section at the top of this report.

## P.B.I. HEARING

| Hearing Date | | PBI# | | Investigation # | |
|---|---|---|---|---|---|
| March 8, 2017 | | 16-0590 | | IAD# 14-1404 | |

| Accused Name | | Badge # | |
|---|---|---|---|
| Police Officer Reginald Graham | | 6214 | |

| Payroll # | | District / Unit | |
|---|---|---|---|
| 220827 | | Narcotics Strike Force | |

| Article Section/Spec. | Penalty Range | Board President Finding/Penalty | Board Member Finding/Penalty | Board Member Finding/Penalty | Overall Findings/ Recommendation |
|---|---|---|---|---|---|
| 1-5009-10 | 10 Days Suspension to Dismissal | Guilty/Dismissal | Guilty/Dismissal | Guilty/Dismissal | Guilty/Dismissal |
| 1-8026-10 | 30 Days Suspension to Dismissal | Guilty/Dismissal | Guilty/Dismissal | Guilty/Dismissal | Guilty/Dismissal |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| | | | Total | Guilty - Dismissal |
|---|---|---|---|---|
| | Board President | Board Member | Board Member | |
| Signature Line: | | | | |

Additional recommendations (transfer, restitution, demotion)

**Department Advocate** (Signature/date/overall recommendations)

1-009-10 - Guilty - Dismissal

LT Kern ─ #91   3-8-17   1-026-10 Guilty Dismissal

**Deputy Commissioner** (Signature/date/overall recommendations)

1-009-10 Guilty Dismissal

DC Carll   3-8-17   1-026-10 Guilty - Dismissal

**Police Commissioner** (Signature /date/overall penalty)

Richard Ross 3-8-17   1-009-10 Guilty Dismissal
1-026-10 Guilty Dismissal

**PERSONNEL (only)**

☐ Suspension notice prepared.

☐ Suspension notice sent.
Date:


EXHIBIT
C

# P.B.I. HEARING

| Hearing Date | PBI# | Investigation # |
|---|---|---|
| March 8, 2017 | 16-0590 | IAD# 14-1404 |

| Accused Name | Badge # |
|---|---|
| Police Officer Reginald Graham | 6214 |

| Payroll # | District / Unit |
|---|---|
| 220827 | Narcotics Strike Force |

| Article Section/Spec. | Penalty Range | Board President Finding/Penalty | Board Member Finding/Penalty | Board Member Finding/Penalty | Overall Findings/ Recommendation |
|---|---|---|---|---|---|
| 1-5009-10 | 10 Days Suspension to Dismissal | Guilty/Dismissal | Guilty / Dismissal | Guilty / Dismissal | Guilty / Dismissal |
| 1-5026-10 | 30 Days Suspension to Dismissal | Guilty/Dismissal | Guilty/Dismissal | Guilty/Dismissal | Guilty / Dismissal |
| | | | | | |
| | | | | | |
| | | | | | |

Sep. - 3/15/17

Place In File

Guilty - Dismissed

**Signature Line:** Board Pre~

Additional recommendations (transfer, restitution, d~

Department Advocate (Signature/date/overall recommendation)

1-009-10 - Guilty - Dismissal
L. Ke~~  #41   3-8-17   1-026-10 - Guilty - Dismissal

Deputy Commissioner (Signature/date/overall recommendations)

1-009-10  Guilty  Dismissal
D.C. Cal~   3-8-17   1-026-10  Guilty - Dismissal

Police Commissioner (Signature/date/overall penalty)

1-009-10  Guilty Disml
Ric~~   3-8-17   1-026-0  G~ Dml

**...SONNEL (only)**

☐ Suspension notice prepared.

☐ Suspension notice sent.

Date:

| P.B.I. Hearing | | |
|---|---|---|
| Accused Name<br>P/O Reginald Graham | Badge # 6214 | PBI # 16-0590 |
| District/Unit Narcotics Strike Force | Payroll # 220827 | Investigation # IAD# 14-1404 |
| Hearing Date 03/08/17 | | |

**Board Members**

Capt. John Przepiorka #80
Lt. Kevin Rice #98
P/O Michael Lewis #2930

**Witnesses**

Sgt. Chester O'Neill #8785
Special Agent John Hess (FTA)
Pastor Warren Martin Sr.
Mr. John Dobey
Mr. Cory Long

| FOP Attorney | Conflict Attorney |
|---|---|
| | Qawi Abdul-Rahman |

**FOP Representative**

Scott Bradley

2

| STATEMENT OF CHARGES FILED AND ACTION TAKEN | CITY OF PHILADELPHIA POLICE DEPARTMENT | FBI CASE NO. 16-0590 |
|---|---|---|
| | | DATE 10/28/2016 |

**TO: POLICE COMMISSIONER**

| FILED AGAINST P/OFF Reginald Graham #6214 | PLATOON & GROUP ASSIGNMENT D1 | DISTRICT OR UNIT Narcotics Strike Force No |
|---|---|---|
| DATE OF APPOINTMENT 3/6/1995 | PAYROLL NUMBER 220827 | DATES OF VACATION, MIL. LEAVE, ETC. |

IAD#14-1404

CHARGES

**ARTICLE I** : Conduct Unbecoming

**SECTION 1-§026-10** : Engaging in any action that constitutes the commission of a felony or a misdemeanor which carries a potential sentence of more than (1) year. Engaging in any action that constitutes an intentional violation of Chapter 39 of the Crimes Code (relating to Theft and Related Offenses). Also includes any action that constitutes the commission of an equivalent offense in another jurisdiction, state or territory. Neither a criminal conviction nor the pendency of criminal charges is necessary for disciplinary action in such matters.

**SPECIFICATION** : Internal Affairs Investigation #14-1404 determined that you engaged in criminal conduct and committed theft while working as a police officer in the Narcotics Field Unit.

**WITNESS** : Sergeant Gerald Deacon #835, Internal Affairs Division

*"Transfer may be part of the formal disciplinary process."*

| APPROVED BY C/O CHARGING UNIT (Date) Captain Francis McIlhenny #83   10/26/2016 | PRESENTED BY DISTRICT COMMANDER/DIVISION (Signature & Date) |
|---|---|
| I understand that in Pleading Guilty to matters which do not qualify for Command Level Discipline, my Commanding Officer shall make a recommendation concerning a penalty. The Police Commissioner shall not be bound by that recommendation. | RECEIVED BY (Signature of Accused) 1-19-17 |
| ☐ I Plead Guilty and Waive a Hearing.  (Signature & Date) | ☑ I Plead Not Guilty & Request a Hearing.  (Signature & Date) 1-19-17 |

75-18 (Rev. 12/200)

| STATEMENT OF CHARGES FILED AND ACTION TAKEN | CITY OF PHILADELPHIA POLICE DEPARTMENT | IAI CASE NO. 16-0590 |
|---|---|---|
| | | DATE 10/28/2016 |

**TO: POLICE COMMISSIONER**

| FILED AGAINST P/OFF Reginald Graham #6214 | PLATOON & GROUP ASSIGNMENT D1 | DISTRICT OR UNIT Narcotics Strike Force No |
|---|---|---|
| DATE OF APPOINTMENT 3/6/1995 | PAYROLL NUMBER 220827 | DATE(S) OF VACATION, MIL. LEAVE, ETC. |

IAD#14-1404

CHARGES

**ARTICLE I**          : Conduct Unbecoming

**SECTION 1-§009-10** : Lying or attempting to deceive regarding a material fact during the course of any Departmental investigation

**SPECIFICATION**     : Internal Affairs Investigation #14-1404 determined that you lied during this investigation.

**WITNESS**           : Sergeant Gerald Deacon #835, Internal Affairs Division

*"Transfer may be part of the formal disciplinary process."*

| APPROVED BY C/O CHARGING UNIT (Date) Captain Francis Mcilhenny #83    10/28/2016 | PROCESSED BY DISTRICT OR UNIT COMMANDER (Signature & Date) |
|---|---|
| I understand that in Pleading Guilty to matters which do not qualify for Command Level Discipline, my Commanding Officer shall make a recommendation concerning a penalty. The Police Commissioner shall not be bound by that recommendation. | RECEIVED BY (Signature of Accused)                    (Date) 1-19-17 |
| ☐ I Plead Guilty and Waive a Hearing   (Signature & Date) | ☑ I Plead Not Guilty & Request a Hearing   (Signature & Date) 1-19-17 |

75-18 (Rev. 2/2006)

| EMPLOYEE ASSESSMENT | CITY OF PHILADELPHIA POLICE DEPARTMENT | PBI CASE NO. 16-0590 |
|---|---|---|
| | | DATE 11-03-16 |

**TO: POLICE COMMISSIONER**

| FILED AGAINST | PLATOON & GROUP ASSIGNMENT | DISTRICT OR UNIT |
|---|---|---|
| P/OFF Reginald Graham #6214 | D1 | Narcotics Field Unit |

| DATE OF APPOINTMENT | PAYROLL NUMBER | DATES OF VACATION, MIL., LEAVE, ETC. |
|---|---|---|
| 3/6/1995 | 220827 | |

**SUPERVISOR'S EVALUATION: (Signature & Date)**

Per Sgt. Meehan P/O Graham conducted himself in a professional manner and is hard working and knowledgeable and he would rate him satisfactorily.

**EMPLOYEE'S AWARDS & COMMENDATIONS:**

**PBI – DISCIPLINARY RECORD:**

Prior PBI Disciplinary Record:        01/22/00 – PBI#00-0127 – Charge 4.20 – Guilty – 2 days

Penalty Range:                              1-§009-10:  10 days to Dismissal
                                                     1-§026-10:  30 days or Dismissal

Command Level Discipline **may not** be applied, Vacation time **may not** be used.

**COMMANDING OFFICER'S RECOMMENDATIONS: (Guilty pleas only)**

**COMMANDING OFFICER (Signature & Date)**

75-18A